# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket 40554

STATE OF IDAHO,

    Plaintiff-Respondent-Cross Appellant,

v.

CHARLYNDA LYNN GOGGIN,

    Defendant-Appellant-Cross Respondent.

)
)
)
)
)
)
)
)
)
)

Boise, June 2014 Term

2014 Opinion No. 90

Filed: August 22, 2014

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Richard D. Greenwood, District Judge.

The decisions of the district court are <u>affirmed</u> in part and <u>reversed</u> in part.

Silvey Law Office, Star, for appellant. Greg S. Silvey argued.

Honorable Lawrence G. Wasden, Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

---

J. JONES, Justice

This appeal arises from the conviction of Charlynda Goggin for conspiracy to manufacture, deliver or possess with intent to deliver a controlled substance; conspiracy to deliver or possess with intent to deliver drug paraphernalia; delivery of a controlled substance; and delivery of drug paraphernalia. After the jury returned a guilty verdict, Goggin filed a motion to acquit and a motion for a new trial. The district court denied the motion to acquit but granted the motion for a new trial on the conspiracy charges, holding that the jury should have been instructed that mistake of law is a defense to conspiracy. We affirm in part and reverse in part.

## I.
## BACKGROUND

In September 2011, in response to a tip regarding suspicious activity, the Boise Police Department began investigating a warehouse in Boise leased by a man named Morgan Alley. The police conducted surveillance of the warehouse, observing who came and went, and seized trash discarded outside the warehouse on multiple occasions. Upon obtaining a warrant, Detective Joseph Andreoli searched the warehouse and found synthetic cannabinoids and the materials

1

necessary to manufacture products containing synthetic cannabinoids.[1] Andreoli testified that the warehouse contained "all of the items necessary" to manufacture synthetic marijuana, "including chemical; plant material; acetone, which is used as a solvent; and tobacco flavoring." The warehouse also contained "the packaging materials, such as the small plastic containers, lids, and sticker labels" necessary to package a finished synthetic marijuana product. In fact, the warehouse was set up in an assembly line fashion and contained synthetic marijuana in various stages of completion. The warehouse also contained finished synthetic marijuana products in small plastic containers labeled with stickers reading "Twizted Potpourri."

During the course of the investigation, the police expanded their surveillance to include the Red Eye Hut (the Red Eye), a Boise store owned by the limited liability company for which Morgan Alley was the registered agent. Detective Andreoli stated that the Red Eye "appeared to be a head shop"[2] due to the nature "of the items for sale inside." The shop contained various types of pipes, concealment containers, grinders, digital scales, drug testing kits, and "body-cleansing solutions to defeat drug tests." At one point, Detectives Kevin Holtry and Jason Harmon entered the Red Eye in an undercover capacity and purchased three containers of Twizted Potpourri and a metal pipe from Goggin. Testing showed that one of these containers contained plant material treated with JWH-019 and the other two containers contained plant material treated with AM-2201. Both JWH-019 and AM-2201 are synthetic cannabinoids. Thereafter, the police executed search warrants on the warehouse and the Red Eye, seizing approximately 30,000 containers of Twizted Potpourri from the warehouse and over 9,000 containers of Potpourri and 340 pipes from the Red Eye.

Goggin was arrested and ultimately admitted to selling Twizted Potpourri and a pipe to Harmon and to working at the warehouse. She was charged with conspiracy to manufacture, deliver or possess with intent to deliver a controlled substance in violation of Idaho Code sections 37-2732(a), 18-1701, and 37-2732(f); conspiracy to deliver or possess with intent to deliver drug paraphernalia in violation of Idaho Code sections 37-2734B and 18-1701; delivery of a controlled substance in violation of Idaho Code section 37-2732(a); and delivery of drug paraphernalia in violation of Idaho Code section 37-2734B. Her case was consolidated with co-defendants Morgan

---

[1] Throughout the record, the terms "synthetic cannabinoid," "synthetic marijuana," "spice," and "potpourri" are used interchangeably. Technically, synthetic cannabinoids are the actual chemicals that resemble the chemicals found in marijuana. Synthetic marijuana is the name of the product consisting of plant material treated with synthetic cannabinoid. Spice and potpourri are street names for synthetic marijuana.

[2] According to Andreoli, a head shop is a store that "caters to drug users . . . ."

Alley, Tashina Alley, Cadee Peterson, Matthew Taylor, Hieu Phan, and Tonya Williams. Prior to trial, Goggin joined in a motion to dismiss filed by Morgan Alley, in which he argued that AM-2201 was not a Schedule I controlled substance. The district court denied this motion, holding that even though AM-2201 was not specifically named in Schedule I, the Legislature intended for it to be included within Schedule I's scope.[3] Subsequently, Alley entered a conditional guilty plea, but preserved his right to appeal the district court's denial of his motion to dismiss. *State v. Alley*, 155 Idaho 972, 975, 318 P.3d 962, 965 (Ct. App. 2014). After hearing Alley's appeal, the Court of Appeals reversed the district court's decision, holding that whether AM-2201 falls under Schedule I "is a factual question that cannot be resolved in a pretrial motion to dismiss." *Id.* at 980–81, 318 P.3d at 970–71.

Four of the defendants—Goggin, Peterson, Taylor, and Tashina Alley—proceeded to jury trial. The jury convicted Goggin on all counts. Goggin then filed a motion pursuant to I.C.R. 29 for judgment of acquittal on all charges and a separate motion for new trial. The district court issued a memorandum decision denying the motion for acquittal and denying a new trial on the delivery counts, but granting a new trial on the two conspiracy counts because it did not instruct the jury that a mistake of law is a defense to conspiracy.

Goggin timely appeals the order denying her motion to acquit and denying her motion for a new trial on the delivery charges. The State cross-appeals from the order granting a new trial on the conspiracy charges.

## II.
## ISSUES ON APPEAL

I.     Did the district court err when it denied Goggin's motion to acquit for insufficient evidence?

II.     Did the district court err when it denied Goggin's motion for a new trial on the delivery charges?

III.     Did the district court err when it granted Goggin's motion for a new trial on the conspiracy charges?

## III.
## STANDARD OF REVIEW

The Court reviews a trial court's ruling on a motion for acquittal for substantial evidence. *State v. Adamcik*, 152 Idaho 445, 460, 272 P.3d 417, 432 (2012). The Court reviews a trial court's

---

[3] Goggin has not appealed the district court's decision to deny the motion to dismiss.

ruling on a motion for new trial for an abuse of discretion. *State v. Cantu*, 129 Idaho 673, 674, 931 P.2d 1191, 1192 (1997). The Court exercises free review over questions of law. *Rhoades v. State*, 149 Idaho 130, 132, 233 P.3d 61, 63 (2010).

# IV.
# ANALYSIS

On appeal, Goggin contends that the district court erred in denying her motion for acquittal. She argues in the alternative that the district court erred in denying her motion for a new trial on the delivery counts. The State cross-appeals, arguing that the district court erred in granting a new trial on the conspiracy counts. These issues will be addressed in turn.

### A. Motion to Acquit

Goggin contends that the district court erred in denying her motion to acquit because there was insufficient evidence to support her convictions. Under I.C.R. 29, the district court may set aside a jury verdict and enter judgment of acquittal "if the evidence is insufficient to sustain a conviction."

> The Fourteenth Amendment of the United States Constitution guarantees the right to due process, and the U.S. Supreme Court has held that as a part of that due process, "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."

*Adamcik*, 152 Idaho at 460, 272 P.3d at 432 (quoting *Jackson v. Virginia*, 443 U.S. 307, 316, (1979)). Nonetheless, "[a]ppellate review of the sufficiency of the evidence is limited in scope." *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998).

> The relevant inquiry is not whether this Court would find the defendant to be guilty beyond a reasonable doubt, but whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Adamcik*, 152 Idaho at 460, 272 P.3d at 432 (quoting *Jackson*, 443 U.S. at 319) (emphasis in original).

Thus, "the only inquiry for this Court is whether there is substantial evidence upon which a reasonable jury could have found that the State met its burden of proving the essential elements" of the charged crimes "beyond a reasonable doubt." *Id.* "Evidence is substantial if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been prove[n]." *State v. Severson*, 147 Idaho 694, 712, 215 P.3d 414, 432 (2009). In conducting its analysis, "the Court is required to consider the evidence in the light most favorable to the State,"

but will not substitute its "judgment for that of the jury on issues of witness credibility, weight of the evidence, or reasonable inferences to be drawn from the evidence." *Adamcik*, 152 Idaho at 460, 272 P.3d at 432.

Here, viewing the evidence in the light most favorable to the State, there is substantial evidence in the record to support Goggin's convictions. The statute under which Goggin was convicted for delivery of a controlled substance provides that "[e]xcept as authorized . . . , it is unlawful for any person to . . . deliver . . . a controlled substance." I.C. § 37-2732(a). The statute under which Goggin was convicted for delivery of drug paraphernalia provides that "[i]t is unlawful for any person to deliver . . . drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to . . . ingest . . . a controlled substance." I.C. § 37-2734B.

Goggin's conspiracy convictions were based on two statutes: Idaho Code section 18-1701 and Idaho Code section 37-2732 (f). Idaho Code section 18-1701 provides:

> If two (2) or more persons combine or conspire to commit any crime or offense prescribed by the laws of the state of Idaho, and one (1) or more of such persons does any act to effect the object of the combination or conspiracy, each shall be punishable upon conviction in the same manner and to the same extent as is provided under the laws of the state of Idaho for the punishment of the crime or offenses that each combined to commit.

Idaho Code section 37-2732(f) provides: "If two (2) or more persons conspire to commit any offense defined in this act, said persons shall be punishable by a fine or imprisonment, or both, which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the conspiracy." Thus, Goggin's conspiracy convictions require that she combine or conspire with another person to deliver a controlled substance and to deliver paraphernalia.

A "controlled substance" is a drug or substance "in schedules I through V" of Idaho's Uniform Controlled Substances Act. I.C. § 37-2701(e). Schedule I lists substances that the State Board of Pharmacy has determined have a "high potential for abuse" and have "no accepted medical use in treatment in the United States" or lack "accepted safety for use in treatment under medical supervision." I.C. § 37-2704. At the time Goggin was arrested and charged, Schedule I listed:

> Tetrahydrocannabinols or synthetic equivalents of the substances contained in the plant, or in the resinous extractives of Cannabis, sp. and/or synthetic substances,

5

derivatives, and their isomers with similar chemical structure such as the following:

\* \* \*

ii. The following synthetic drugs:

a. Any compound structurally derived from 3-(1-naphthoyl)indole or 1H-indol-3-yl-(1-naphthyl)methane by substitution at the nitrogen atom of the indole ring by alkyl . . .

I.C. § 37-2705(d)(30) (2011), *amended by* I.C. § 37-2705(d)(31) (2013).

The district court instructed the jury that AM-2201, JWH-019, and JWH-210 were controlled substances. Goggin has not appealed that instruction. In an augmentation to her brief on appeal, however, Goggin argues that under *State v. Alley*, she could have "pursue[d] a mistake of fact defense if the jury found that AM-2201 did not have a similar chemical structure to one of the example substances listed" under Schedule I.[4] Yet, Goggin has not asked this Court whether the district court properly determined that AM-2201 is a controlled substance.

Goggin argues that she must be acquitted of all her convictions because she did not know the product she was selling contained a synthetic cannabinoid. That is, she did not know that the Twizted Potpourri contained synthetic cannabinoids. In the alternative, she maintains that even if she did know that the Twizted Potpourri contained synthetic cannabinoids, she did not know the synthetic cannabinoids in the Twizted Potpourri were Schedule I substances—she believed the synthetic cannabinoids were legal. For example, she argues that

the State presented evidence from Morgan Alley that he told Charlynda that the materials she was handling were legal, going as far as to show her a lab report as scientific proof. So not only was there no evidence that she knew the plant material contained a controlled substance, the evidence was to the contrary.

This issue centers on whether the State was required to prove Goggin knew that the synthetic cannabinoids in the Twizted Potpourri were illegal and whether the State presented sufficient evidence to prove Goggin knew that the Twizted Potpourri contained synthetic cannabinoids.

In ruling on Goggin's motion for acquittal on the delivery and paraphernalia charges, the

---

[4] In *Alley*, the Court of Appeals concluded that it was a question of fact as to whether the substance in Twizted Potpourri, AM-2201, was an illegal synthetic cannabinoid since its specific chemical formulation was not listed in the non-exclusive list of example synthetic equivalents following the "such as" language in I.C. § 37-2705(d)(30). 155 Idaho at 980−81, 318 P.3d at 970−71. However, the plain language used by the Legislature banned all forms of synthetic marijuana and the subsequent list of specific chemical formulations merely provided examples of the illegal substances. The fact that AM-2201 had a slight variation from the substances specifically listed as exemplars does not change the fact that the Legislature intended to ban all types and forms of synthetic marijuana, regardless of their chemical formulations.

6

district court noted:

> The testimony did not specify there were no synthetic cannabinoids shown by the lab report, only that the material "did not contain anything illegal." Whether or not the substance detected by the laboratory was illegal is, of course, a legal decision and one for this Court to decide.

The court observed that, while there was no evidence to show Goggin knew the material in the Twizted Potpourri "was a controlled substance other than a synthetic cannabinoid," there was "substantial evidence from which a jury could conclude that Goggin knew the material was a synthetic cannabinoid."

The district court correctly determined that the State was not required to prove Goggin knew the synthetic cannabinoids in the Twizted Potpourri were illegal. The delivery of paraphernalia statute requires that the defendant deliver paraphernalia knowing that it will be used to "ingest . . . a controlled substance." I.C. § 37-2734B. Thus, if Goggin knew the pipe she sold with the Twizted Potpourri was intended to ingest synthetic cannabinoids, she had the mental state necessary for conviction for delivery of paraphernalia. Although the delivery of controlled substances statute—I.C. § 37-2732(a)—does not expressly require a mental element, Idaho Code section 18-114 provides that "[i]n every crime or public offense there must exist a union, or joint operation, of act and intent, or criminal negligence." I.C. § 18-114. The Court has explained "that the intent required by I.C. § 18-114 is not the intent to commit a crime, but is merely the intent to knowingly perform" the prohibited act. *State v. Fox*, 124 Idaho 924, 926, 866 P.2d 181, 183 (1993). Therefore, because Idaho Code section 37-2732(a) does not expressly require any mental element and Idaho Code section 18-114 only requires general intent, delivery under section 37-2732(a) only requires the knowledge that one is delivering the substance. *See Fox*, 124 Idaho at 926, 866 P.2d at 183 (concluding that because Idaho Code section 37-2732(c), which makes possession of a controlled substance illegal, "does not expressly require any mental element and I.C. § 18-114 only requires a general intent, we conclude that the offense only requires a general intent, that is, the knowledge that one is in possession of the substance").

This knowledge element requires that the defendant know the identity of the substance. *State v. Blake*, 133 Idaho 237, 242, 985 P.2d 117, 122 (1999); *State v. Armstrong*, 142 Idaho 62, 64, 122 P.3d 321, 323 (Ct. App. 2005) ("[T]he defendant's ignorance of the presence of the substance, or mistaken belief that it was an innocuous material, if believed by the jury, would be exculpatory."). "For example, one who truly believed that the powdery substance in a package

7

was a harmless item, such as sugar, could not be convicted of possession." *Armstrong*, 142 Idaho at 65, 122 P.3d at 324 (citing *Blake*, 133 Idaho at 242, 985 P.2d at 122). This knowledge "may be proved by direct evidence or may be inferred from the circumstances." *Id.*

Importantly, knowledge of a particular substance's identity is not synonymous with knowledge of a particular substance's illegality. *Blake*, 133 Idaho at 240, 985 P.2d at 120 ("[T]he individual need not know the substance possessed is a controlled substance."). In *Fox*, the defendant was charged with possession of a controlled substance—ephedrine—under Idaho Code section 37-2732(c). 124 Idaho at 925, 866 P.2d at 182. Although in some states ephedrine was a legal over-the-counter drug, in Idaho it was listed as a Schedule II substance in the Uniform Controlled Substances Act. *Id.* Nonetheless, the defendant argued that he did not know ephedrine was illegal and, therefore, a good faith mistake of law excused his possession of the ephedrine. *Id.* at 926, 866 P.2d at 183. This argument failed because "[i]gnorance of the law is not a defense." *Id.* The Court explained:

> [t]his is simply a case where [the defendant] possessed a substance, knowing full well what the substance was, but claiming now that he did not know it was listed in the statutes as a controlled substance. There is nothing in that argument which would rise to the level of a viable defense.

*Id.* Indeed, the defendant did "not claim that he did not know that he possessed ephedrine[,]" just that he did not know ephedrine was illegal. *Id.* As a result, any evidence tending to establish his "lack of knowledge that ephedrine was illegal" was "irrelevant" because mistake of law is not a defense. *Id.* Thus, for a possession of a controlled substance conviction, a defendant must have knowledge of possession, not knowledge that the substance possessed is controlled under the law. By extension, then, for a delivery of a controlled substance conviction, a defendant must have knowledge of delivery, not knowledge that the substance to be delivered is controlled.

As a result, Goggin's arguments as to her ignorance of the illegality of the synthetic cannabinoids in the Twizted Potpourri are irrelevant. Regardless of whether Alley informed Goggin that the substances in the Twizted Potpourri were legal, and regardless of whether Goggin believed him, if Goggin knew the Twizted Potpourri contained synthetic cannabinoids, she had the mental state necessary for conviction for delivery. The record contains substantial evidence upon which a reasonable jury could have found, beyond a reasonable doubt, that the State met its burden of proving that Goggin knowingly delivered synthetic cannabinoids and knowingly delivered a pipe for ingesting synthetic cannabinoids.

8

Andreoli testified that when he entered Alley's warehouse, it was set up for manufacturing synthetic marijuana and contained completed synthetic marijuana products packaged and ready for sale. These containers were labeled with stickers reading: "Not for human consumption," "Must be 18 plus to purchase," and "Complies with federal and state laws." Later, Andreoli observed similar containers of Twizted Potpourri for sale in the Red Eye, priced at $15 per gram. As a comparison, Andreoli testified that he had found "traditional potpourri" in "traditional stores such as Walmart and Target." This traditional potpourri was packaged in boxes or plastic bags, sold in large quantities, and was "quite cheap." In fact, Andreoli "purchased a large quantity of [traditional] potpourri for $5." This traditional potpourri is used for its aroma and is added to water.

As to the Red Eye, Andreoli explained that he believed it to be a head shop. Andreoli explained that head shops are "typically disguised as a smoke shop or a tobacco shop, but they are, in fact, head shops that cater to drug users." He stated that head shops attempt to disguise the true nature of their products "in their name themselves, and the signage and the verbiage that they use within the store. . . . [Y]ou won't see a store called a head shop in its actual business name. It will be called a smoke shop or a tobacco shop." Essentially, "the name itself and the signing on the outside of the store would make one who didn't know better believe that the shop was for tobacco use or for tobacco users or just a normal smoke shop."

The significance of the name Alley's store—"The Red Eye Smoke Shop"—and the logo associated with the store—a "bloodshot red eye" with attached wings—were discussed at trial. Andreoli testified that

> [r]ed eyes are quite often associated with persons under the influence of marijuana. The bloodshot red eyes are a – especially for law enforcement – a common sign of somebody being under the influence of a controlled substance, specifically marijuana.
>
> It's also well-known among the drug culture that marijuana causes red, bloodshot eyes. In the picture, you can see the red, bloodshot eye, which, again, is very much so associated with marijuana use.
>
> The wings on the eye itself stand out to me in being that wings are meant to make someone fly or make something fly. And the high associated with marijuana is often referred to as flying or getting high, which obviously wings would enable a person to do.
>
> So this is very symbolic of marijuana and drug culture to me.

Beyond the name of the store, Andreoli also discussed the Red Eye's inventory. Along with items like chips, candy, and drinks, the Red Eye contained

9

> numerous glass pipes. . . . [,] metal pipes and smaller pipes, which are considered one-hitters, just to smoke a small amount of marijuana or synthetic cannabinoids. There were also concealment containers inside. There was large water pipes, which . . . we call bongs. Smaller water pipes, which are considered bubblers.

> There were grinders, digital scales, drug testing kits, pipe cleansing solution, along with body-system cleansing solutions to defeat drug tests. . . . [T]here were actual pipes that had the number 420 on them.

> There were – there was a blanket or a tapestry of – bearing the image of Bob Marley hanging from one of the walls inside the store.

Furthermore, tobacco was only "1 to 2 percent" of the Red Eye's entire inventory. Andreoli stated that the contents of the Red Eye brought him "to the conclusion that the Red Eye Hut was a head shop." He explained that in a head shop, one would find expect to find

> pipes, the water pipes, the bongs, grinders, concealment containers, the pipe cleansing solution. Oftentimes you'll find roach clips for sale, digital scales that are used to weigh an illegal substance. Again, you'll see a lot of reference to the 420. You'll also see reference to an individual named Bob Marley, who is associated with the marijuana subculture.

Andreoli explained that Bob Marley "was a reggae singer, and actually a – quite a good one. But he was just as well known for his marijuana use . . . . The majority of the pictures that you will find of Bob Marley have him smoking from a marijuana cigarette." Bob Marley "actually sang many songs about smoking marijuana. He was iconic in – and still is – in the marijuana subculture." Andreoli also stated that inside a shop that "caters to drug users," he finds "numerous items" relating to drug testing, "including drug-testing kits, and solutions or shampoos used or designed to defeat a urinalysis drug test."

Andreoli also testified that the items found in the Red Eye were consistent with paraphernalia found in many drug investigations. He explained he "typically" sees

> glass pipes; water pipes, which are referred to as bubblers; large water pipes, which are also referred to as bongs. There are grinders, which are used to grind the marijuana bud down into a finer substance to be smoked through a marijuana joint. . . .

> Concealment containers, which are made to look like household items such as a Pringles container – the long, tubular Pringles container—that has a false bottom on it to be able to hide things inside; specifically drugs.

Andreoli explained that in his "over ten years as a law enforcement officer," he has "never seen a glass pipe or a glass water pipe or a glass bong be used to smoke tobacco." Instead, Andreoli saw them used "[m]ainly to smoke marijuana and, more recently, to smoke marijuana as well as

10

synthetic cannabinoids."

Andreoli testified that in an actual smoke shop, one would expect to find

> [a] large humidor where good, fancy, or nice cigars are kept. Smoking devices, but much different than what you see in a head shop. Typically, the pipes located at an actual tobacco shop are dealing in corncob pipe or a wooden pipe. You never see a glass pipe at a true tobacco store.

He also stated that in actual smoke shops, "there is much more tobacco than there is actual smoking devices."

On September 26th, Detectives Kevin Holtry and Jason Harmon entered the Red Eye in an undercover capacity and were assisted by Goggin. She talked with the detectives about the Red Eye's products and would pull out any product in which they were interested. Harmon eventually paid Goggin for three containers of Twizted Potpourri and a metal pipe. Goggin told the detectives that the pipe Harmon purchased "was popular among her friends and that they were going to be mad at her or something for selling it." Later, in an interview with Andreoli, Goggin first stated

> that she didn't necessarily . . . work at the Red Eye Hut, but she volunteered her time to help Morgan out. She advised that the Red Eye Hut opened on – I believe it was September 22. And she stated that she worked at the store on that day and worked – has worked every day since the store opened on the 22nd.

> She explained her duties as opening the store each morning. And she remained in full control of the store until she was later relieved in the day by the store owner, Morgan Alley.

"Initially," when Andreoli "asked her what types of items she sold, she identified that she sold cigarettes, she sold snacks, she sold soda." Andreoli explained that Goggin "basically listed all the items in the store that are legal and admitted to selling those." After Andreoli "confronted" Goggin "with the fact that she had sold synthetic cannabinoids in the form of Twizted Potpourri as well as drug paraphernalia to an undercover detective," she "admitted that she has sold the Twizted Potpourri and she has also sold the paraphernalia inside the store." Goggin went on to explain that she has sold "the Twizted Potpourri and the paraphernalia" at other times, although Andreoli clarified that Goggin probably described the items he referred to as "paraphernalia," "pipes," or "the glassware."

Goggin also initially "denied knowledge as to where the Potpourri came from." After Andreoli "confronted" her "with the fact that she had been seen during surveillance at the warehouse" she "became truthful" and admitted involvement with the warehouse. She told

11

Andreoli "that her main job at the warehouse was to affix the stickers on the lids of the containers . . . . , but there were also occasions where she weighed and filled the containers or fastened the lids on the containers as well."

When Andreoli asked Goggin "if she personally has used" Twizted Potpourri, "she smiled . . . and said, 'It's not for human consumption.'" Andreoli explained: "I asked Ms. Goggin to be truthful with me and asked her what the intended use of the Twizted Potpourri was, and she said, quote, 'I'm not going to say it,' end quote. She then went on to say further that she would just agree that she and I both knew what it was intended for."

Thus, there is sufficient evidence in the record to support a finding that Goggin knew the Twizted Potpourri contained synthetic cannabinoids and knew the pipe would be used to ingest that substance. The warehouse in which Goggin admitted she worked housed an operation that applied synthetic cannabinoids to plant material to manufacture Twizted Potpourri. Goggin admitted that she herself assisted in packaging the Twizted Potpourri and the store in which Goggin worked, the Red Eye, served as a retail outlet for the Potpourri. Although Goggin contends that she knew neither that the Twizted Potpourri contained synthetic cannabinoids nor that the Twizted Potpourri was intended to be smoked, it was reasonable for the jury to have found otherwise. The State presented considerable evidence that the Red Eye catered to drug users and sold items intended to be used in conjunction with marijuana and synthetic marijuana. When Goggin herself sold the Potpourri to the undercover detectives, she sold it with a pipe, a device commonly used to smoke marijuana. She told the detectives that her own friends were interested in the pipe she sold to them. Furthermore, the evidence suggested that the Twizted Potpourri was not, in fact, consistent with traditional potpourri, but contained synthetic marijuana. Finally, Goggin's references to the legality of the Twizted Potpourri and her lies about her relationship with the warehouse and the Red Eye suggest that she knew the Potpourri contained synthetic cannabinoids.

Goggin presented evidence and made arguments attempting to show that she was ignorant of the synthetic cannabinoids in the Twizted Potpourri and the district court gave the jury an instruction as to mistake of fact. The jury did not accept this argument, and there is substantial evidence in the record to support its decision. Therefore, we affirm the district court's decision to deny her motion to acquit.

### B. Motion for New Trial

Goggin contends that the district court erred when it refused to grant her motion for a new

trial on the delivery charges. The State argues that the district court erred when it granted Goggin's motion for a new trial on the conspiracy charges. A court may grant a new trial if it has "misdirected the jury on a matter of law . . . ." I.C. § 19–2406(5). Under I.C.R. 34, "[t]he court . . . may grant a new trial to the defendant if required in the interest of justice." "A trial court has wide discretion to grant or refuse to grant a new trial, and, on appeal, this Court will not disturb that exercise of discretion, absent a showing of manifest abuse." *State v. Cantu*, 129 Idaho 673, 674, 931 P.2d 1191, 1192 (1997). When determining whether the district court abused its discretion, this Court conducts a three-tiered inquiry:

> (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason.

*Id.* Here, the issue centers on whether the district court acted consistently with the legal standards applicable to jury instructions.

Where "the new trial motion turned upon the propriety of a jury instruction, . . . this Court exercises free review." *State v. Armstrong*, 142 Idaho at 62, 64, 122 P.3d 321, 323 (Ct. App. 2005). "If the instructions taken as a whole, and not individually, fairly and adequately present the issues, state the applicable law, and do not mislead the jury or prejudice a party, then there is no reversible error." *Id.*

### 1.    Order Denying New Trial on the Delivery Charges

As to the delivery convictions, Goggin argues that "reversal and new trial . . . is required because the jury instructions were misleading." She argues that "the mistake of law instruction removed . . . the knowledge element from the crimes of delivery." At trial, the district court instructed the jury that "[w]hen the evidence shows that a person voluntarily did that which the law declares to be a crime, it is no defense that the person did not know that the act was unlawful or that the person believed it to be lawful." As previously discussed, under Idaho Code section 37-2732(a), the State was required to prove that Goggin knew the Twizted Potpourri contained synthetic cannabinoids. Under Idaho Code section 37-2734B, the State was required to prove that Goggin knew the pipe would be used to ingest a controlled substance. And, of course, mistake of law is not a defense to knowledge of a substance's identity. *State v. Fox*, 124 Idaho 924, 926, 866 P.2d 181, 183 (1993). Thus, whether Goggin knew that synthetic cannabinoids were illegal is irrelevant. Therefore, the mistake of law instruction did not remove the knowledge

13

element from the delivery counts.

Furthermore, a review of all the instructions reveals that the jury was not misled and was required to find that Goggin had knowledge that the Twizted Potpourri contained synthetic cannabinoids and that the pipe would be used to ingest the same. Under Instruction 36, the jury could not reach a guilty verdict for delivery of a controlled substance unless it found that Goggin "either knew" she had delivered "a Schedule I synthetic cannabinoid or believed it was a controlled substance." Similarly, under Instruction 40, the jury could not reach a guilty verdict for delivery of paraphernalia unless it found that Goggin delivered the metal pipe "knowing, or under circumstances where the defendant reasonably should know, that it would be used to ingest a controlled substance."

As a result of these instructions, the jury could convict Goggin of delivery of a controlled substance only if it found that she either knew or believed that the Twizted Potpourri contained a synthetic cannabinoid. Similarly, the jury could convict Goggin of delivery of paraphernalia only if it found that she either knew or believed that the pipe she sold was to be used to ingest a controlled substance. Thus, we affirm the district court's decision to deny Goggin's motion for a new trial as to the delivery charges because the instructions did not mislead the jury into believing it had to convict Goggin even if she was unaware that the Twizted Potpourri contained synthetic cannabinoids or that the pipe was to be used to ingest a controlled substance.

### 2. Order Granting a New Trial on the Conspiracy Charges

As to the conspiracy charges, the State argues that the district court erred when it granted Goggin's motion for a new trial. The district court granted this motion because, in its view, "[t]he jury should have been instructed that a good faith belief that the object crime was not illegal is a defense to conspiracy." At trial, the district court instructed the jury that for Goggin to be guilty of conspiracy to manufacture, deliver or possess with intent to deliver a controlled substance, she must have agreed "to commit the crimes of manufacturing, and/or delivering, and/or possessing with the intent to deliver, a controlled substance, to-wit: Schedule I synthetic cannabinoids;" and she must have "intended that at least one of the crimes would be committed . . . ." Similarly, the district court instructed the jury that for Goggin to be guilty of conspiracy to deliver or possess with the intent to deliver drug paraphernalia, she must have agreed "to commit the crimes of delivery of drug paraphernalia and or/possession with the intent to deliver drug paraphernalia, to wit: glass and metal pipes; bongs; scales; and/or a variety of

14

containers;" and she must have "intended that at least one of the crimes would be committed . . . ." The State contends that the district court's instructions to the jury were correct because "nowhere in the conspiracy statutes or in the case law interpreting them is there any requirement that the state also prove the defendant intended to violate the law or knew of the illegality of the agreed-upon act." Goggin contends that the conspiracy statutes "do not merely provide that a defendant agree to commit an act which happens to be illegal, rather, the statutes require that the defendant enter into an agreement to commit an act which he or she knows is illegal."[5]

In support of her position, Goggin rests heavily on the notion that, historically, conspiracy was a specific intent crime. It appears this Court has not directly addressed whether Idaho's codified conspiracy statutes require specific intent, although the Court of Appeals has assumed they do. *State v. Rolon*, 146 Idaho 684, 691, 201 P.3d 657, 664 (Ct. App. 2008) ("While an Idaho court has not explicitly held as much, it is generally accepted that conspiracy is a specific intent crime that requires the intent to agree or conspire *and* the intent to commit the offense which is the object of the conspiracy. *See* 15A C.J.S. Conspiracy § 112 (June 2008).").

Regardless, the common law status of conspiracy is not particularly relevant to the issues presented here. Instead, to determine the mental state required for conviction, this Court looks to the text of the relevant statutes.

> This Court has previously ruled that whether a criminal intent is a necessary element of a statutory offense is a matter of construction, to be determined from the language of the statute in view of its manifest purpose and design, and where such intent is not made an ingredient of the offense, the intention with which the act is done, or the lack of any criminal intent in the premises, is immaterial.

*Fox*, 124 Idaho at 925–26, 866 P.2d at 182–83 (quotations omitted).

The statutes under which Goggin was convicted of conspiracy—Idaho Code section 18-1701 and Idaho Code section 37-2732(f)—do not provide for a specific mental state. Idaho Code section 18-1701 provides:

> If two (2) or more persons combine or conspire to commit any crime or offense prescribed by the laws of the state of Idaho, and one (1) or more of such persons does any act to effect the object of the combination or conspiracy, each shall be punishable upon conviction in the same manner and to the same extent as is

---

[5] Goggin attempts to argue that the State waived this issue because it failed to argue to the district court that mistake of law is not a defense to conspiracy. This is simply incorrect—the State did attempt to persuade the district court that it was not required to prove intent to violate the law.

provided under the laws of the state of Idaho for the punishment of the crime or offenses that each combined to commit.

Idaho Code section 37-2732(f) provides: "If two (2) or more persons conspire to commit any offense defined in this act, said persons shall be punishable by a fine or imprisonment, or both, which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the conspiracy." We have stated: "It is axiomatic that a conspiracy is established upon proof beyond a reasonable doubt that there is an agreement between two or more individuals to accomplish an illegal objective, coupled with one or more overt acts in the furtherance of the illegal purpose accompanied by the requisite intent to commit the underlying substantive offense." *State v. Garcia*, 102 Idaho 378, 384, 630 P.2d 665, 671 (1981).

Goggin does not dispute that she entered into an agreement with Morgan Alley to deliver the Twizted Potpourri or the pipe. Instead, she argues that because she did not know that the Potpourri contained an illegal substance, she could not have conspired to deliver the Potpourri or paraphernalia. Yet, this goes beyond what is required by the language of the statutes. The statutes require that two or more people agree to commit an illegal act. A person commits an illegal act by engaging in the activities prohibited by statute. Therefore, a person will have committed conspiracy when she agrees with another person to engage in activities prohibited by statute.

For example, a person is guilty of conspiracy to deliver a controlled substance under Idaho Code section 37-2732(f) when she and another person agree to deliver a controlled substance. The statute does not require the State to prove that the defendant knew it was illegal to deliver a controlled substance. Under this analysis, then, to be convicted of conspiracy, a defendant must have simply intended to engage in the acts necessary to commit the underlying substantive offense. Thus, whether the defendant knows the acts are illegal is irrelevant. This is consistent with the general rule that, in Idaho,

> [i]gnorance of the law is not a defense. *See e.g., Hale v. Morgan,* 22 Cal.3d 388, 149 Cal.Rptr. 375, 380, 584 P.2d 512, 517 (1978) ("[I]n the absence of specific language to the contrary, ignorance of a law is not a defense to a charge of its violation."); *State v. Einhorn,* 213 Kan. 271, 515 P.2d 1036, 1039 (1973) ("The general rule is that ignorance of the law does not disprove criminal intent.")

*Fox*, 124 Idaho at 926, 866 P.2d at 183.

Other courts have interpreted similar conspiracy statutes to mean that the defendant must, with the mental state required by the underlying offense, only agree to engage in the conduct prohibited by the underlying offense, not that the defendant must know the acts are illegal. In

*U.S. v. Feola*, the defendant was convicted of conspiracy under 18 U.S.C § 371, which defines conspiracy as occurring when "two or more persons conspire . . . to commit any offense against the United States, . . . and one or more of such persons do any act to effect the object of the conspiracy." 420 U.S. 671 (1975). In considering this issue, the Supreme Court found "no textual support for the proposition that to be guilty of a conspiracy a defendant in effect must have known that his conduct violated federal law." *Id.* at 687. Indeed, the conspiracy statute

> makes it unlawful simply to "conspire . . . to commit any offense against the United States." A natural reading of these words would be that since one can violate a criminal statute simply by engaging in the forbidden conduct, a conspiracy to commit that offense is nothing more than an agreement to engage in the prohibited acts.

*Id.* The Court also noted that in the past, it had "declined to require a greater degree of intent for conspiratorial responsibility than for responsibility for the underlying substantive offense." *Id.* at 688 (citing *United States v. Freed*, 401 U.S. 601 (1971)). Similarly, in *U.S. v. Haldeman*, a case the district court relied on when it decided to grant a new trial, the Circuit Court of Appeals for the District of Columbia stated: "a defendant does not have to be aware that he was violating a particular law, such as 18 U.S.C. § 371, so long as he had the conscious intent to do that which the law in fact forbids." *United States v. Haldeman*, 559 F.2d 31, 117 (D.C. Cir. 1976).

In this case, because neither Idaho Code section 18-1701 nor Idaho Code section 37-2732(f) contain specific language providing for a mistake of law defense, Goggin's argument fails. We reverse the district court's decision to grant her a new trial on the conspiracy charges.

## V.
## CONCLUSION

For the above reasons, we affirm the district court's decision to deny Goggin's motion to acquit and to deny Goggin's motion for a new trial on the delivery charges. We reverse the district court's decision to grant Goggin a new trial on the conspiracy charges.

Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.