# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket 40553

STATE OF IDAHO,

    Plaintiff-Respondent-Cross Appellant,

v.

MATTHEW STEVEN TAYLOR,

    Defendant-Appellant-Cross Respondent.

)
)
)
)
)
)
)
)
)
)

Boise, June 2014 Term

2014 Opinion No. 98

Filed: September 19, 2014

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Richard D. Greenwood, District Judge.

The judgment of the district court is <u>affirmed</u> in part and <u>reversed</u> in part.

Nevin, Benjamin, McKay & Bartlett, LLP, Boise, for appellant. Dennis A. Benjamin argued.

Honorable Lawrence G. Wasden, Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

---

J. JONES, Justice

This appeal arises from the conviction of Matthew Taylor for conspiracy to manufacture, deliver or possess with intent to deliver a controlled substance; conspiracy to deliver or possess with intent to deliver drug paraphernalia; and delivery of a controlled substance. After the jury returned a guilty verdict, Taylor filed a motion to acquit and a motion for a new trial. The district court denied the motion to acquit, as well as the motion for new trial on the delivery charge, but granted the motion for a new trial on the conspiracy charges, holding that the jury should have been instructed that mistake of law is a defense to conspiracy. We affirm in part and reverse in part.

## I.
## BACKGROUND

In September 2011, in response to a tip regarding suspicious activity, the Boise Police Department began investigating a warehouse in Boise leased by a man named Morgan Alley. The police conducted surveillance of the warehouse, observing who came and went, and seized trash discarded outside the warehouse on multiple occasions. Upon obtaining a warrant, Detective

Joseph Andreoli searched the warehouse and found synthetic cannabinoids and the materials necessary to manufacture products containing synthetic cannabinoids.[1] Andreoli testified that the warehouse contained "all of the items necessary" to manufacture synthetic marijuana, "including chemical; plant material; acetone, which is used as a solvent; and tobacco flavoring." The warehouse also contained "the packaging materials, such as the small plastic containers, lids, and sticker labels" necessary to package a finished synthetic marijuana product. In fact, the warehouse was set up in an assembly line fashion and contained synthetic marijuana in various stages of completion. The warehouse also contained finished synthetic marijuana products in small plastic containers labeled with stickers reading "Twizted Potpourri."

During the course of the investigation, the police expanded their surveillance to include the Red Eye Hut, a Boise store owned by the limited liability company for which Morgan Alley was the registered agent. Detective Andreoli stated that the Red Eye "appeared to be a head shop"[2] due to the nature "of the items for sale inside." The shop contained various types of pipes, concealment containers, grinders, digital scales, drug testing kits, and "body-cleansing solutions to defeat drug tests." One evening, Detective Andreoli visited the Red Eye in an undercover capacity and purchased three containers of Twizted Potpourri from Matthew Taylor. Testing showed that two of these containers contained JWH-019 and the other contained AM-2201. Both JWH-019 and AM-2201 are synthetic cannabinoids. Thereafter, the police executed search warrants on the warehouse and the Red Eye, seizing approximately 30,000 containers of Twizted Potpourri from the warehouse and over 9,000 containers of Potpourri and 340 pipes from the Red Eye.

Taylor was subsequently charged with conspiracy to manufacture, deliver or possess with intent to deliver a controlled substance in violation of Idaho Code sections 37-2732(a), 18-1701, and 37-2732(f); conspiracy to deliver or possess with intent to deliver drug paraphernalia in violation of Idaho Code sections 37-2734B and 18-1701; and delivery of a controlled substance in violation of Idaho Code section 37-2732(a). His case was consolidated with co-defendants Morgan Alley, Tashina Alley, Cadee Peterson, Charlynda Goggin, Hieu Phan, and Tonya Williams. Prior to trial, Taylor moved to dismiss all charges against him arguing that the State could not prove that he knew the Twizted Potpourri contained a controlled substance. The district court denied this

---

[1] Throughout the record, the terms "synthetic cannabinoid," "synthetic marijuana," "spice," and "potpourri" are used interchangeably. Technically, synthetic cannabinoids are the actual chemicals that resemble the chemicals found in marijuana. Synthetic marijuana is the name of the product consisting of plant material treated with synthetic cannabinoid. Spice and potpourri are street names for synthetic marijuana.

[2] According to Andreoli, a head shop is a store that "caters to drug users . . . ."

motion.[3]

Taylor proceeded to jury trial along with three other defendants including Goggin. Taylor was convicted on all counts, as was Goggin.[4] Taylor then filed a motion pursuant to I.C.R. 29 for judgment of acquittal on all charges and a separate motion for new trial. The district court issued a memorandum decision denying the motion for acquittal and denying a new trial on the delivery count, but granting a new trial on the two conspiracy counts because it did not instruct the jury that a mistake of law is a defense to conspiracy. Taylor timely appeals the order denying his motion to acquit and denying his motion for a new trial on the delivery charge. The State cross-appeals from the order granting a new trial on the conspiracy charges.[5]

## II.
## ISSUES ON APPEAL

I.     Did the district court err when it denied Taylor's motion to acquit for insufficient evidence?

II.     Did the district court err when it denied Taylor's motion for a new trial on the delivery charge?

III.     Did the district court err when it granted Taylor's motion for a new trial on the conspiracy charges?

## III.
## ANALYSIS

Taylor contends that the district court erred in denying his motion for acquittal on the delivery and conspiracy charges. He argues in the alternative that the district court erred in denying his motion for a new trial on the delivery charge. The State cross-appeals, arguing that the district court erred in granting a new trial on the conspiracy counts. These issues will be addressed in turn.

---

[3] Morgan Alley, with several other defendants, filed a motion to dismiss prior to trial, arguing that AM-2201 was not a Schedule I controlled substance. Taylor did not join in this motion to dismiss. The district court denied the motion, holding that even though AM-2201 was not specifically named in Schedule I, the Legislature intended for it to be included within the scope of Schedule I. Subsequently, Alley entered a conditional guilty plea but preserved his right to appeal the district court's denial of his motion to dismiss. *State v. Alley*, 155 Idaho 972, 975, 318 P.3d 962, 965 (2014). After hearing Alley's appeal, the Court of Appeals reversed the district court's decision, holding that whether AM-2201 falls under Schedule I "is a factual question that cannot be resolved in a pretrial motion to dismiss." *Id.* at 980–81, 318 P.3d at 970–71

[4] Goggin was convicted on the same three charges as Taylor, plus a charge for delivery of drug paraphernalia.

[5] In Goggin's case, the district court similarly denied her motions for acquittal and for new trial on the delivery charges, but granted a new trial on the conspiracy charges. Goggin appealed and the State cross-appealed. This Court issued its opinion affirming the denial of the motion to acquit and for new trial on the delivery charges but reversing the order granting a new trial on the conspiracy charges. *State v. Goggin*, 2014 WL 4160019 (Idaho Aug. 22, 2014). The Goggin and Taylor appeals share a consolidated record.

**A. Motion to Acquit**

Taylor contends that the district court erred in denying his motion to acquit because there was insufficient evidence to support his convictions. Under I.C.R. 29, the district court may set aside a jury verdict and enter judgment of acquittal "if the evidence is insufficient to sustain a conviction."

> The Fourteenth Amendment of the United States Constitution guarantees the right to due process, and the U.S. Supreme Court has held that as a part of that due process, "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."

*State v. Adamcik*, 152 Idaho at 445, 460, 272 P.3d 417, 432 (2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 316, (1979)). Nonetheless, "[a]ppellate review of the sufficiency of the evidence is limited in scope." *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998).

> The relevant inquiry is not whether this Court would find the defendant to be guilty beyond a reasonable doubt, but whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Adamcik*, 152 Idaho at 460, 272 P.3d at 432 (quoting *Jackson*, 443 U.S. at 319) (emphasis in original).

Thus, "the only inquiry for this Court is whether there is substantial evidence upon which a reasonable jury could have found that the State met its burden of proving the essential elements" of the charged crimes "beyond a reasonable doubt." *Id.* "Substantial evidence is more than a scintilla of proof, but less than a preponderance. In short, it is relevant evidence which a reasonable mind might accept to support a conclusion." *Matter of Wilson*, 128 Idaho 161, 164, 911 P.2d 754, 757 (1996). In conducting its analysis, "the Court is required to consider the evidence in the light most favorable to the State," but will not substitute its "judgment for that of the jury on issues of witness credibility, weight of the evidence, or reasonable inferences to be drawn from the evidence." *Adamcik*, 152 Idaho at 460, 272 P.3d at 432.

The statute under which Taylor was convicted for delivery of a controlled substance provides that "[e]xcept as authorized . . . , it is unlawful for any person to . . . deliver . . . a controlled substance." I.C. § 37-2732(a). The statute under which Taylor was convicted for conspiracy to deliver drug paraphernalia provides that "[i]t is unlawful for any person to deliver

4

. . . drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to . . . ingest . . . a controlled substance." I.C. § 37-2734B.

Taylor's conspiracy convictions were based on two statutes: I.C. § 18-1701 and § 37-2732 (f). Idaho Code section 18-1701 provides:

> If two (2) or more persons combine or conspire to commit any crime or offense prescribed by the laws of the state of Idaho, and one (1) or more of such persons does any act to effect the object of the combination or conspiracy, each shall be punishable upon conviction in the same manner and to the same extent as is provided under the laws of the state of Idaho for the punishment of the crime or offenses that each combined to commit.

Idaho Code section 37-2732(f) provides: "If two (2) or more persons conspire to commit any offense defined in this act, said persons shall be punishable by a fine or imprisonment, or both, which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the conspiracy." Thus, Taylor's conspiracy convictions require that he combine or conspire with another person to deliver a controlled substance and to deliver paraphernalia used with a controlled substance.

As to the delivery conviction, Taylor states that the district court denied the motion for acquittal on the basis that there was evidence Taylor knew he was dealing with a synthetic cannabinoid. He then contends, "even if someone believed that there was evidence Mr. Taylor knew that he was dealing with a synthetic cannabinoid. . . . there was absolutely no evidence that Mr. Taylor knew either that every synthetic cannabinoid is illegal or in the alternative that he possessed a particular synthetic cannabinoid that is illegal. Rather, the evidence showed that Mr. Taylor had been told that the potpourri was legal." Acknowledging that the district court had granted a new trial on the conspiracy charges, Taylor asserts that the district court erred in failing to grant the motion to acquit on those counts because the State failed to prove "either an agreement to deliver a Schedule I substance or an intent to deliver a Schedule I substance."

Responding to the same arguments made by Goggin in her appeal, this Court stated:

> Goggin's arguments as to her ignorance of the illegality of the synthetic cannabinoids in the Twizted Potpourri are irrelevant. Regardless of whether Alley informed Goggin that the substances in the Twizted Potpourri were legal, and regardless of whether Goggin believed him, if Goggin knew the Twizted Potpourri contained synthetic cannabinoids, she had the mental state necessary for conviction for delivery. The record contains substantial evidence upon which a reasonable jury could have found, beyond a reasonable doubt, that the State met its

5

burden of proving that Goggin knowingly delivered synthetic cannabinoids and knowingly delivered a pipe for ingesting synthetic cannabinoids.

*Goggin*, 2014 WL 4160019 at *6. In other words, a conviction for delivery of a controlled substance will be sustained where the defendant knowingly delivers synthetic cannabinoids even though the defendant may not know they are illegal.

The Court went on to recite evidence supporting Goggin's conviction, which equally applies here:

> Andreoli testified that when he entered Alley's warehouse, it was set up for manufacturing synthetic marijuana and contained completed synthetic marijuana products packaged and ready for sale. These containers were labeled with stickers reading: "Not for human consumption," "Must be 18 plus to purchase," and "Complies with federal and state laws." Later, Andreoli observed similar containers of Twizted Potpourri for sale in the Red Eye, priced at $15 per gram. As a comparison, Andreoli testified that he had found "traditional potpourri" in "traditional stores such as Walmart and Target." This traditional potpourri was packaged in boxes or plastic bags, sold in large quantities, and was "quite cheap." In fact, Andreoli "purchased a large quantity of [traditional] potpourri for $5." This traditional potpourri is used for its aroma and is added to water.

> As to the Red Eye, Andreoli explained that he believed it to be a head shop. Andreoli explained that head shops are "typically disguised as a smoke shop or a tobacco shop, but they are, in fact, head shops that cater to drug users." He stated that head shops attempt to disguise the true nature of their products "in their name themselves, and the signage and the verbiage that they use within the store. . . . [Y]ou won't see a store called a head shop in its actual business name. It will be called a smoke shop or a tobacco shop." Essentially, "the name itself and the signing on the outside of the store would make one who didn't know better believe that the shop was for tobacco use or for tobacco users or just a normal smoke shop."

> The significance of the name of Alley's store—"The Red Eye Smoke Shop"—and the logo associated with the store—a "bloodshot red eye" with attached wings—were discussed at trial. Andreoli testified that

>> [r]ed eyes are quite often associated with persons under the influence of marijuana. The bloodshot red eyes are a – especially for law enforcement – a common sign of somebody being under the influence of a controlled substance, specifically marijuana.

>> It's also well-known among the drug culture that marijuana causes red, bloodshot eyes. In the picture, you can see the red, bloodshot eye, which, again, is very much so associated with marijuana use.

>> The wings on the eye itself stand out to me in being that wings are meant to make someone fly or make something fly. And the high

6

associated with marijuana is often referred to as flying or getting high, which obviously wings would enable a person to do.

So this is very symbolic of marijuana and drug culture to me.

Beyond the name of the store, Andreoli also discussed the Red Eye's inventory. Along with items like chips, candy, and drinks, the Red Eye contained

> numerous glass pipes. . . . [,] metal pipes and smaller pipes, which are considered one-hitters, just to smoke a small amount of marijuana or synthetic cannabinoids. There were also concealment containers inside. There was large water pipes, which . . . we call bongs. Smaller water pipes, which are considered bubblers.

> There were grinders, digital scales, drug testing kits, pipe cleansing solution, along with body-system cleansing solutions to defeat drug tests. . . . [T]here were actual pipes that had the number 420 on them.

> There were – there was a blanket or a tapestry of – bearing the image of Bob Marley hanging from one of the walls inside the store.

Furthermore, tobacco was only "1 to 2 percent" of the Red Eye's entire inventory. Andreoli stated that the contents of the Red Eye brought him "to the conclusion that the Red Eye Hut was a head shop." He explained that in a head shop, one would find expect to find

> pipes, the water pipes, the bongs, grinders, concealment containers, the pipe cleansing solution. Oftentimes you'll find roach clips for sale, digital scales that are used to weigh an illegal substance. Again, you'll see a lot of reference to the 420. You'll also see reference to an individual named Bob Marley, who is associated with the marijuana subculture.

Andreoli explained that Bob Marley "was a reggae singer, and actually a—quite a good one. But he was just as well known for his marijuana use . . . . The majority of the pictures that you will find of Bob Marley have him smoking from a marijuana cigarette." Bob Marley "actually sang many songs about smoking marijuana. He was iconic in – and still is – in the marijuana subculture." Andreoli also stated that inside a shop that "caters to drug users," he finds "numerous items" relating to drug testing, "including drug-testing kits, and solutions or shampoos used or designed to defeat a urinalysis drug test."

Andreoli also testified that the items found in the Red Eye were consistent with paraphernalia found in many drug investigations. He explained that he "typically" sees

> glass pipes; water pipes, which are referred to as bubblers; large water pipes, which are also referred to as bongs. There are grinders, which are used to grind the marijuana bud down into a

finer substance to be smoked through a marijuana joint. . . .

> Concealment containers, which are made to look like household items such as a Pringles container – the long, tubular Pringles container—that has a false bottom on it to be able to hide things inside; specifically drugs.

Andreoli explained that in his "over ten years as a law enforcement officer," he has "never seen a glass pipe or a glass water pipe or a glass bong be used to smoke tobacco." Instead, Andreoli saw them used "[m]ainly to smoke marijuana and, more recently, to smoke marijuana as well as synthetic cannabinoids."

Andreoli testified that in an actual smoke shop, one would expect to find

> [a] large humidor where good, fancy, or nice cigars are kept. Smoking devices, but much different than what you see in a head shop. Typically, the pipes located at an actual tobacco shop are dealing in corncob pipe or a wooden pipe. You never see a glass pipe at a true tobacco store.

He also stated that in actual smoke shops, "there is much more tobacco than there is actual smoking devices."

*Id.* at *7−*8.

In addition to the foregoing evidence which applied generally to the four defendants, the record contains evidence applying specifically to Taylor. During his investigation, Andreoli entered the store as a customer and was greeted by Taylor. Taylor told Andreoli that the "store had just recently opened. . . ." and "that the same location has been a head shop for quite some time, but it just had recently changed ownership and changed name." Taylor also explained that he had "worked for the previous owner at this same location when it was also a head shop, and the name of that head shop was City of Trees." When Andreoli asked Taylor about the Twizted Potpourri on display, Taylor told Andreoli that "it was the same substance that used to be called Spice."

When Andreoli asked Taylor whether "there was a certain pipe that he recommended to smoke this stuff with" Taylor explained that "'[t]echnically, the stuff's not for human consumption.'" "Then, in a lower tone, almost in a whisper, he said, '[w]e kind of have to say that.'" Taylor went on to suggest that the plain "Ultra" version of the Twizted Potpourri was "a good one because it has no added flavor." Andreoli testified that Taylor explained "basically what you['re] to do with it is what they say you're not supposed to." Andreoli took this statement as "[b]asically, an acknowledgment that, although they say it's not for human consumption, it actually

is. I think it was pretty plain by his language."

Taylor told Andreoli "that all the Twizted Potpourri is made locally by the owner of the Red Eye Hut." He also explained that the owner "wholesales his product, Twizted Potpourri, across the country." Taylor "pointed to a back room and said something to the effect of, 'We have a bunch of boxes of this stuff in the back ready for wholesale.'" Ultimately, Detective Andreoli purchased three containers of Twizted Potpourri from Taylor.

Later, in an interview with Andreoli, Taylor claimed that he did not recognize the detective. Taylor also initially stated that he did not work at the Red Eye in a formal capacity— he told Andreoli that on September 23rd, three days before Andreoli purchased the Twizted Potpourri, he was just visiting the Red Eye at Morgan Alley's invitation. He stated that "at one point" during this visit, "Morgan had to leave the store and asked" him "to watch the store . . . ." Although "Taylor said that he did watch the store for Morgan Alley[,]" he "stated that he did not make any sales and was not given any instruction from Morgan as to how to operate the store." Even though Taylor initially "denied even working at the Red Eye Hut. . . . [,]" he later told Andreoli "that there were four separate occasions—four separate days when he maintained full control over the store." Nonetheless, "[h]e said that if somebody came into the store wishing to purchase something, that he would wait until Morgan Alley himself arrived back to the store before he would make any sales."

Furthermore, Taylor "denied selling" Andreoli "the Twizted Potpourri on September 26, 2011." Throughout the interview, Taylor "continued to deny this." Andreoli said of the exchange: "I even brought up things to try to jog his memory, such as his admission that he had worked for the previous owner under the name City of Trees. He denied telling me this as well." "Near the end of the interview," Taylor also "made a couple of statements about Morgan Alley, saying 'You already got the bad guy. Morgan is the bad guy.'"

There is sufficient evidence in the record to support a finding that Taylor knew the Twizted Potpourri contained synthetic cannabinoids. The store in which Taylor worked, the Red Eye, served as a retail outlet for the Potpourri. Taylor had knowledge of the manufacturing and shipping operation—he told Andreoli that Morgan Alley made the Twizted Potpourri and distributed it to other retailers. Although Taylor contends that he knew neither that the Twizted Potpourri contained synthetic cannabinoids nor that the Twizted Potpourri was intended to be smoked, it was reasonable for the jury to have found otherwise. The State presented considerable evidence that the

9

Red Eye catered to drug users and sold items intended to be used in conjunction with marijuana and synthetic marijuana. Taylor himself referred to the Red Eye as a head shop and to the Twizted Potpourri as Spice. He recommended a particular variety of Twizted Potpourri because it had no added flavor. Furthermore, the evidence suggested that the Twizted Potpourri was not, in fact, consistent with traditional potpourri, but with synthetic marijuana. Taylor's explanation that "technically" the Twizted Potpourri was not for human consumption, his lies about his relationship to the Red Eye, and his assertion that Alley is "the bad guy" suggest that he knew the Potpourri contained synthetic cannabinoids. The jury also had sufficient basis to determine that Taylor was working in concert with Alley in carrying out the Red Eye's business activities.

Taylor presented evidence and made arguments attempting to show that he was ignorant of the synthetic cannabinoids in the Twizted Potpourri and the district court gave the jury an instruction as to mistake of fact. The jury did not accept his evidence or arguments, and there is substantial evidence in the record to support its decision. Therefore, we affirm the district court's decision to deny Taylor's motion to acquit.

### B. Motion for New Trial

Taylor contends that the district court gave erroneous jury instructions and therefore erred when it denied his motion for a new trial. The State argues that the district court erred when it granted Taylor's motion for a new trial on the conspiracy charges. A court may grant a new trial if it has "misdirected the jury on a matter of law . . . ." I.C. § 19–2406(5). Under I.C.R. 34, "[t]he court . . . may grant a new trial to the defendant if required in the interest of justice." "A trial court has wide discretion to grant or refuse to grant a new trial, and, on appeal, this Court will not disturb that exercise of discretion, absent a showing of manifest abuse." *State v. Cantu*, 129 Idaho 673, 674, 931 P.2d 1191, 1192 (1997). When determining whether the district court abused its discretion, this Court conducts a three-tiered inquiry:

> (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason.

*Id.* Here, the issue centers on whether the district court acted consistently with the legal standards applicable to jury instructions.

Where "the new trial motion turned upon the propriety of a jury instruction, . . . this Court exercises free review." *State v. Armstrong*, 142 Idaho at 62, 64, 122 P.3d 321, 323 (Ct.

App. 2005) "If the instructions taken as a whole, and not individually, fairly and adequately present the issues, state the applicable law, and do not mislead the jury or prejudice a party, then there is no reversible error." *Id.*

### 1. Order Denying New Trial on the Delivery Charge.

As to the delivery conviction, Taylor argues that when the district court instructed the jury that mistake of law is no defense, it "relieved the State from having to prove . . . that Mr. Taylor knowingly delivered a controlled substance." At trial, the district court instructed the jury that "[w]hen the evidence shows that a person voluntarily did that which the law declared to be a crime, it is no defense that the person did not know that the act was unlawful or that the person believed it to be lawful."

The district court did not err when it instructed the jury that mistake of law is no defense. As set forth above, the State was only required to prove that Taylor knew he had delivered synthetic cannabinoids, not that he knew the synthetic cannabinoids were illegal. Whether Taylor knew that synthetic cannabinoids were illegal is irrelevant. Therefore, the mistake of law instruction did not remove the knowledge element from the delivery counts. *See Goggin* at *10−*11.

Furthermore, a review of all the instructions suggests that the jury was not misled and was required to find that Taylor had knowledge that the Twizted Potpourri contained synthetic cannabinoids. Particularly relevant to this inquiry is Instruction 45, which provided that for Taylor to be guilty of delivery of a controlled substance, the State had to "prove each of the following:"

1. On or about September 26, 2011;
2. in the state of Idaho;
3. the defendant MATTHEW STEVEN TAYLOR delivered any amount of a controlled substance to another; and
4. the defendant either knew it was a Schedule I synthetic cannabinoid or believed it was a controlled substance.

If any of the above has not been proven beyond a reasonable doubt, you must find the defendant not guilty. If each of the above has been proven beyond a reasonable doubt, then you must find the defendant guilty.

Thus, under Instruction 45, the jury could not reach a guilty verdict for delivery of a controlled substance unless if found that Taylor "either knew" he had delivered "a Schedule I synthetic cannabinoid or believed it was a controlled substance." Therefore, the jury could

11

convict Taylor of delivery of a controlled substance only if it found that he either knew or believed that the Twizted Potpourri contained a synthetic cannabinoid. We affirm the district court's decision to deny Taylor's motion for a new trial as to the delivery charge because the instructions did not mislead the jury into believing it had to convict Taylor even if he was unaware that the Twizted Potpourri contained synthetic cannabinoids.

### 2. Order Granting a New Trial on the Conspiracy Charges.

As to the conspiracy charges, the State argues that the district court erred when it granted Taylor's motion for a new trial. The district court granted this motion because, in its view, "[t]he jury should have been instructed that a good faith belief that the object crime was not illegal is a defense to conspiracy." At trial, the district court instructed the jury that for Taylor to be guilty of conspiracy to manufacture, deliver or possess with intent to deliver a controlled substance, he must have agreed "to commit the crimes of manufacturing, and/or delivering, and/or possessing with the intent to deliver, a controlled substance, to-wit: Schedule I synthetic cannabinoids;" and he must have "intended that at least one of the crimes would be committed . . . ." Similarly, the district court instructed the jury that for Taylor to be guilty of conspiracy to deliver or possess with the intent to deliver drug paraphernalia, he must have agreed "to commit the crimes of delivery of drug paraphernalia and or/possession with the intent to deliver drug paraphernalia, to wit: glass and metal pipes; bongs; scales; and/or a variety of containers;" and he must have "intended that at least one of the crimes would be committed . . . ." The State contends that the district court's instructions to the jury were correct because "Idaho's conspiracy statutes contain no language, much less specific language, indicating that ignorance of the law would disprove guilt."

Taylor counters that the district court correctly ruled on his motion for new trial on the conspiracy charges. He does not dispute that he entered into an agreement with Alley to deliver Twizted Potpourri or paraphernalia. Instead, he argues that because he did not know that the potpourri contained an illegal substance, he could not have conspired to deliver a controlled substance or drug paraphernalia. Taylor essentially makes the same arguments that proved to be of no avail in Goggin's appeal. We reversed the district court's decision to grant Goggin a new trial on her conspiracy charges "because neither Idaho Code section 18-1701 nor Idaho Code section 37-2732(f) contains specific language providing for a mistake of law defense." *Id.* at \*14. The analysis made and the conclusion reached in *Goggin* apply equally here (*Id.* at \*12−\*13) and

12

therefore we reverse the district court's decision to grant Taylor a new trial on the conspiracy charges.

## IV.
## CONCLUSION

For the foregoing reasons, we affirm the district court's decision to deny Taylor's motion to acquit and to deny Taylor's motion for a new trial on the delivery charge. We reverse the district court's decision to grant Taylor a new trial on the conspiracy charges.

Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.