# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: July 19, 2018

**NO. A-1-CA-35498**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JIM ARIAS,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Fred T. Van Soelen, District Judge**

Hector H. Balderas, Attorney General
Maha Khoury, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
B. Douglas Wood III, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**HANISEE, Judge.**

{1}     Defendant Jim Arias appeals his conviction for possession of synthetic cannabinoids in violation of NMSA 1978, Section 30-31-23(B) (2011) of the Controlled Substances Act (CSA), NMSA 1978, §§ 30-31-1 through -41 (1972, as amended through 2018). Defendant contends that there was insufficient evidence to support his conviction because the State failed to meet its burden of proving that the substance in his possession was a "synthetic cannabinoid" within the meaning of the term as used in the CSA. We agree and reverse.

**BACKGROUND**

{2}     During a routine visit to Defendant's home, Defendant's probation officer, Isabelle Lucero, noticed that Defendant's appearance and behavior were different than what she was used to, that he "was not in his usual manner." According to Ms. Lucero, Defendant had bloodshot, dilated eyes, difficulty walking, and was slurring his speech. Upon conducting a standard walkthrough of Defendant's house, Ms. Lucero located a "green, leafy substance" sitting on top of a receipt on Defendant's

bedroom dresser. Ms. Lucero suspected the substance was a synthetic cannabinoid, or "spice."[1]

{3}     Officer Travis Loomis of the Clovis Police Department was called to Defendant's home, took possession of the substance, and field tested it for tetrahydrocannabinol (THC), the psychoactive ingredient in marijuana. The substance tested negative for THC. Officer Loomis, who interacted with Defendant and described him as "lethargic" and having "slurred speech[,]" also suspected that the substance was "synthetic cannabis." Based on Officer Loomis's belief that Defendant was in possession of a controlled substance in violation of the CSA, Defendant was arrested and charged with a single count of possession of synthetic cannabinoids, contrary to Section 30-31-23(B).

{4}     The only witnesses who testified at Defendant's bench trial were Ms. Lucero, Ms. Lucero's supervisor who also participated in the visit to Defendant's home, and Officer Loomis. Ms. Lucero and Officer Loomis both offered lay opinions, based on their training and experience, that the substance found on Defendant's dresser was a

---

[1]"Spice" is a common name for "synthetic cannabinoids." *See* Office of Nat'l Drug Control Policy, *Synthetic Drugs* (*a.k.a. K2, Spice, Bath Salts, etc.*), https://obamawhitehouse.archives.gov/ondcp/ondcp-fact-sheets/synthetic-drugs-k2-spice-bath-salts (last visited June 11, 2018). The term "synthetic cannabinoids"—which is the statutory term, *see* § 30-31-6(C)(19)—will be used throughout this opinion in this Court's discussion. The term "spice" will be used to reflect that term's original use by the parties in the record, at trial, and in their briefs.

synthetic cannabinoid. With respect to training, both testified that they received training regarding synthetic cannabinoids in their respective academies, Ms. Lucero describing her academy training as "just a short, little class." Ms. Lucero also testified that she receives email notices from her department several times a year with pictures of "synthetics" and "what's new out there on the streets." With respect to experience, Ms. Lucero testified that in her work as a probation officer, she had come into contact with substances—later confirmed through laboratory testing—that she believed to be synthetic cannabinoids on at least ten occasions. Officer Loomis testified to having come into contact with synthetic cannabinoids fewer than ten times during his time as a police officer.

{5}     Neither offered any testimony regarding the chemical composition of the substance found on Defendant's dresser, and both conceded that they had no training in forensic chemistry and had never personally obtained a positive identification of a synthetic cannabinoid through field or laboratory testing. Officer Loomis had no recollection of sending the substance found on Defendant's dresser to the state crime lab for further testing and confirmation of what the substance was. He conceded that the only thing he could "testify to . . . for sure" is that the substance was not marijuana. When asked on cross-examination if she could identify a synthetic cannabinoid just by looking at it, Ms. Lucero responded, "You can, just, yeah, it's,

it's a green, leafy substance." She then conceded that the "green, leafy substance" found on Defendant's dresser could also be marijuana, oregano, or an imitation substance and that without testing the substance, she could only suspect what the substance was. On redirect examination, when asked whether the substance was synthetic cannabinoids, Ms. Lucero stated, "Yes[,]" without offering any further explanation.

{6}    In addition to eliciting Ms. Lucero's lay testimony as to the identity of the substance, the State moved to qualify Ms. Lucero as an expert on "whether or not . . . Defendant's behavior was consistent with [Ms. Lucero's] observations of other people who are under the influence of synthetic cannabinoids." As to her qualifications to testify as an expert on that issue, Ms. Lucero explained that she had received training from Norchem, the laboratory that does "further confirmation" of various substances for state agencies, and that Norchem had "given us lists of signs, of symptoms of what each substance can cause an individual, how they react." The training included information about symptoms for someone under the influence of various controlled substances, such as cocaine, methamphetamine, and "spice," as well as alcohol. Ms. Lucero also testified that in her experience, people who are under the influence of "spice" behave differently than people who are under the influence of other controlled substances, including marijuana.

4

{7}     Over Defendant's objection, the district court allowed Ms. Lucero to testify as an expert "on the issue of whether or not a person is under the influence of a synthetic cannabinoid versus other substances." Ms. Lucero then testified that she believed that the substance on Defendant's dresser was "the synthetic 'spice' " based on Defendant's "behavior and past issues with past tests on probation." She further opined that with regard to the way Defendant was behaving when she saw him, she believed Defendant was under the influence of synthetic cannabinoids. Specifically, based on her past experience, Ms. Lucero testified that people under the influence of "spice" are "very, very out of it, their eyes are very bloodshot and very dilated, they have a hard time walking, . . . they say off the wall things, . . . their mind . . . is not right, they start just saying different things that don't make sense, you can hardly understand the way they speak, their speech is slurred." Regarding Defendant's behavior on the night in question, Ms. Lucero testified that "his speech was in and out, his speech was very slurred, he was unable to make full sentences that evening."

{8}     After the State rested, Defendant moved for a directed verdict, arguing that the State had failed to meet its burden of proving that the substance alleged to be a synthetic cannabinoid was, in fact, a synthetic cannabinoid. Specifically, Defendant noted that Section 30-31-6(C)(19) of the CSA designates specific chemical compounds as "synthetic cannabinoids" and pointed out that the State presented no

5

evidence regarding the chemical makeup of the substance. Defendant argued that Ms. Lucero's and Officer Loomis's lay opinions that the substance was a synthetic cannabinoid and Ms. Lucero's expert opinion that Defendant was under the influence of synthetic cannabinoid were insufficient on their own to prove that the substance found on Defendant's dresser was a synthetic cannabinoid as the term is defined under the CSA. The State argued that the following evidence supported the inference that the substance was a synthetic cannabinoid: (1) Defendant was "clearly under the influence[;]" (2) Ms. Lucero's opinion that Defendant was under the influence of synthetic cannabinoids; (3) "the effect that the drug had on . . . Defendant[;]" (4) the substance was found in Defendant's bedroom; and (5) the opinions of Ms. Lucero and Officer Loomis that the substance was a synthetic cannabinoid.

{9} The district court denied Defendant's motion and proceeded to evaluate the evidence presented. Regarding Ms. Lucero's opinion that Defendant was under the influence of a synthetic cannabinoid, the district court noted that it was "not giving [that opinion] as much credence maybe as [the State] would hope." The district court explained that Ms. Lucero's "testimony was . . . general enough in nature . . . [and] could describe someone under the influence of alcohol . . . [or] other controlled substances" and that it "was not sure that [it] view[s] that as being synthetic-cannabinoids specific." Nevertheless, the district court found that "[t]here is *some*

circumstantial evidence to support the officers' opinions" and stated that it was "basically basing this off of the officers' opinions itself." Responding to Defendant's arguments that the State failed to present any evidence of the chemical makeup of the substance and that the court could not rely on the officers' opinions, alone, to support conviction, the district court concluded that under New Mexico law, "officers still can identify [a controlled substance] without having a lab test. It goes to the weight of the evidence, not whether it's admissible." The district court then found that "the weight of the evidence is enough here." The district court further reasoned that all of the substances listed in the CSA—and specifically marijuana, cocaine, and methamphetamine—are made up of a specific chemical compound, even if not "spelled out" in the CSA, and that New Mexico case law "tells us that they can be identified without a lab test." The district court explained that it was finding Defendant guilty "based upon the way [the substance] was found, based upon the surrounding circumstances, and based upon the opinions of the officers[.]"

**DISCUSSION**

{10}     We begin by observing, as this Court did in *State v. Maldonado*, 2005-NMCA-072, ¶ 16, 137 N.M. 699, 114 P.3d 379, that "[t]he concept of substantial evidence is meaningless unless it is linked to a specific definition of a crime." The reason for this is simple: "Expand the definition of the crime and evidence that might otherwise be

insufficient becomes 'substantial.' " *Id.* Thus, "[a] court cannot decide whether the [s]tate has come forward with substantial evidence of [an alleged crime] without expressly or implicitly engaging in statutory construction of the [subject] statute." *Id.*; *see, e.g.*, *State v. Stephenson*, 2017-NMSC-002, ¶ 13, 389 P.3d 272 (explaining that "to determine whether [the d]efendant's conviction [under NMSA 1978, Section 30-6-1(B) (2009) for '[a]bandonment of a child'] was supported by sufficient evidence, [the court] must first examine the scope of Section 30-6-1(B), and in particular, must for the first time ascertain the definitions of 'leaving' and 'abandoning' as they are used in Section 30-6-1(B)"); *State v. Olguin*, 1995-NMSC-077, ¶¶ 4-5, 120 N.M. 740, 906 P.2d 731 (construing, first, the bribery and solicitation statute to determine the Legislature's intended meaning of the term "person" as used in that statute, and determining, second, whether the state had met its burden of proving the crime of soliciting a bribe); *State v. Gonzales*, 2011-NMCA-081, ¶¶ 10-32, 150 N.M. 494, 263 P.3d 271 (construing at length the child abuse by endangerment statute, then determining whether the evidence supported every element of the crime as construed).

{11} Here, we must determine whether the evidence was sufficient to convict Defendant of possession of synthetic cannabinoids, a task that depends on what the Legislature intended the term "synthetic cannabinoids" as used in the CSA to mean and include. We begin, then, by construing the term "synthetic cannabinoids."

## I. Construing the Term "Synthetic Cannabinoids" as Used in the CSA

## A. Standard of Review and Applicable Rules of Statutory Construction

{12} "Statutory construction is a matter of law we review de novo." *State v. Nick R.*, 2009-NMSC-050, ¶ 11, 147 N.M. 182, 218 P.3d 868. "The primary goal in interpreting a statute is to give effect to the Legislature's intent." *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064. "To do this, we look to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *State v. Goodman*, 2017-NMCA-010, ¶ 10, 389 P.3d 311 (internal quotation marks and citation omitted). Additionally, our construction may be "informed by the history, background, and overall structure of the statute, as well as its function within a comprehensive legislative scheme." *State v. Almanzar*, 2014-NMSC-001, ¶ 15, 316 P.3d 183 (internal quotation marks and citation omitted).

## B. Section 30-31-6(C)(19) and the Parties' Respective Readings Thereof

{13} Section 30-31-6(C)(19) identifies as one type of hallucinogenic substance controlled under Schedule I of the CSA:

(19)   synthetic cannabinoids, including:

    (a)   1-[2-(4-(morpholinyl)ethyl]-3-(1-naphthoyl)indole;

    (b)   1-butyl-3-(1-napthoyl)indole;

(c)     1-hexyl-3-(1-naphthoyl)indole;

(d)     1-pentyl-3-(1-naphthoyl)indole;

(e)     1-pentyl-3-(2-methoxyphenylacetyl) indole;

(f)     cannabicyclohexanol (CP 47, 497 and homologues:5-(1,1-dimethylheptyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (CP-47,497); and 5-(1,1-dimethyloctyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol;

(g)     6aR,10aR)-9-(hydroxymethyl)-6,6-dimethyl-3-(2-methyloctan-2-yl)-6a,7,10,10a-tetrahydrobenzo[c]chromen-1-ol);

(h)     dexanabinol,(6aS,10aS)-9-(hydroxymethyl)-6,6-dimethyl-3-(2-methyloctan-2-yl)-6a,7,10,10a-tetrahydrobenzo[c]chromen-1-ol;

(i)     1-pentyl-3-(4-chloro naphthoyl) indole;

(j)     (2-methyl-1-propyl-1H-indol-3-yl)-1-naphthalenyl-methanone; and

(k)     5-(1,1-dimethylheptyl)-2-(3-hydroxy cyclohexyl)-phenol[.]

{14}    Defendant argues that Section 30-31-6(C)(19) "defines prohibited synthetic cannabinoid substances as any substance containing a particular chemical designation[,]" specifically and only the eleven enumerated chemical compounds listed in the statute. According to Defendant, because Section 30-31-6(C)(19) "focuses [on] the chemical compounds, there must be proof of those chemical compounds being present" in order to sustain Defendant's conviction. Defendant thus contends that because the State failed to offer any evidence regarding the chemical makeup of the substance found on Defendant's dresser, it could not meet its burden

10

of proof on all elements of the crime charged. The State argues that it "was not required to prove that the green[,] leafy substance found in Defendant's bedroom contained one of the specific chemical compounds listed" in Section 30-31-6(C)(19) and that the eleven enumerated compounds are merely "examples of synthetic cannabinoids; they are not a definition." According to the State, Section 30-31-6(C)(19) "bans all forms of synthetic cannabinoids[,]" a term that the State contends "include[s] all chemical formulations that mimic compounds found in the Cannabis plant."

{15} The parties are each partially correct: the State that the eleven compounds are neither a definition nor an exhaustive list of banned substances, and Defendant that the State failed to meet its burden of proof even under a more expansive reading of the term "synthetic cannabinoids." We explain.

**C.     What Substances Qualify as "Synthetic Cannabinoids" Under the CSA**

{16} In 2011 the Legislature amended the CSA by, among other things, adding to the list of Schedule I controlled substances "synthetic cannabinoids" and making the distribution of, intent to distribute, and/or possession of "synthetic cannabinoids" crimes. *See* 2011 N.M. Laws, ch. 16, § 1. Importantly, the Legislature did not then, nor has it since, expressly defined the term "synthetic cannabinoids" as it has done with other types of controlled substances. *See, e.g.*, § 30-31-2(N) (defining

11

"marijuana" as "all parts of the plant cannabis, including any and all varieties, species and subspecies of the genus Cannabis, whether growing or not, the seeds thereof and every compound, manufacture, salt, derivative, mixture or preparation of the plant or its seeds"); 30-31-2(P) (defining "opiate" as "any substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having addiction-forming or addiction-sustaining liability"). "When a term is not defined in a statute, we must construe it, giving those words their ordinary meaning absent clear and express legislative intention to the contrary." *State v. Tsosie*, 2011-NMCA-115, ¶ 19, 150 N.M. 754, 266 P.3d 34 (internal quotation marks and citation omitted). We must consider what the Legislature intended "synthetic cannabinoids" to mean at the time the Legislature added that term to the list of Schedule I controlled substances. *See State v. Phillips*, 2009-NMCA-021, ¶ 17, 145 N.M. 615, 203 P.3d 146 ("A statute is to be interpreted as the Legislature understood it at the time it was passed." (internal quotation marks and citation omitted)). Additionally, "our interpretation of technical language in a statute can and should be informed by evidence concerning how those technical terms are interpreted by experts in the pertinent field." *Dynacon, Inc. v. D & S Contracting, Inc.*, 1995-NMCA-071, ¶ 21, 120 N.M. 170, 899 P.2d 613.

{17} In 2008 when "synthetic cannabinoids" were first reported in the United States, only a small number of chemical compounds classified as "synthetic cannabinoids" were known. *See supra*, *Synthetic Drugs* (*a.k.a. K2, Spice, Bath Salts, etc.*) (describing "synthetic cannabinoids" as "man-made chemicals that are applied (often sprayed) onto plant material and marketed as a 'legal' high" and explaining that in 2009, there were just two identified "synthetic cannabinoids"). Within a matter of years, the number of such chemicals increased exponentially and has continued to increase ever since. *See id.* (explaining that "[fifty-one] new synthetic cannabinoids were identified in 2012"); Office of Nat'l Drug Control Policy, *New Psychoactive Substances*, https://www.whitehouse.gov/ondcp/key-issues/psychoactive-substances (last visited June 11, 2018) (explaining that "[a]s of August 2016, the United Nations estimated there were over 700 identified [new psychoactive substances[2]] available on the global market").

{18} Congress and state legislatures across the country, including New Mexico's, responded to the "rapidly emerging threat" presented by synthetic cannabinoids by banning such substances via legislative and/or regulatory action. *See supra*, *Synthetic*

---

[2]Synthetic cannabinoids are one type of "new psychoactive substances." *See* Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/publications/drugfacts/synthetic-cannabinoids-k2spice ("Synthetic cannabinoids are part of a group of drugs called new psychoactive substances (NPS).").

*Drugs (a.k.a. K2, Spice, Bath Salts, etc.)* (explaining that Congress passed [t]he Synthetic Drug Abuse Prevention Act as part of the FDA Safety and Innovation Act of 2012a); National Conference of State Legislatures, *Emerging Drug Threats*, http://www.ncsl.org/research/civil-and-criminal-justice/synthetic-drug-threats.aspx#synthetic%20drugs (last visited June 11, 2018) ("Since 2011, all [fifty] states have banned two types of synthetic drugs—cannabinoids . . . and cathinones . . . —with the majority doing so via legislation."). Importantly, the way in which synthetic cannabinoids are regulated has evolved and continues to evolve because of the evolving nature of the substances themselves. *See id.* As explained by the National Conference of State Legislatures:

> Initially, state legislative action targeted specific versions of these drugs with individual bans. Minor changes to the chemical composition of these substances, however, can create new, but very similar, drugs not previously covered by law. In response, legislation in subsequent years has been more general in nature, targeting entire classes of substances or using broad language to describe the prohibited drugs and their effects.

*Id.*

{19}     In New Mexico, the regulation of synthetic cannabinoids has evolved in just this way. At the time the Legislature added "synthetic cannabinoids" to the list of Schedule I controlled substances, it deemed the aforementioned list of eleven chemical compounds to be "synthetic cannabinoids." *See* § 30-31-6(C)(19)(a)-(k). That list was never intended to be exclusive or exhaustive. *See State v. Salazar*, 2018-

14

NMCA-030, ¶ 33, ___P.3d ___ (holding that " 'synthetic cannabinoids' is not limited to those [chemical compounds] that are listed in [S]ubsections (a) through (k) of Section 30-31-6(C)(19)" and explaining that "[t]he word 'including' following the term 'synthetic cannabinoids' expresses a clear legislative intent that the listing of specific examples of 'synthetic cannabinoids' that follows is not exclusive"), *cert. denied*, (No. S-1-SC-36939. Apr. 13, 2018). That is evidenced not only by the language used by the Legislature in the statute itself but also by the fact that shortly after "synthetic cannabinoids" were added to Schedule I, the state Board of Pharmacy—exercising the authority delegated to it by the Legislature, *see* § 30-31-3(A) (providing that the Board "may add by regulation substances to the list of substances enumerated in Schedules I through IV")—added by regulation new substances to the list of "synthetic cannabinoids" and has done so on four other occasions since. *See* 16.19.20.65(C)(32)(a)-(o) NMAC (11/27/2011); 16.19.20.65(C)(32)(p) NMAC (6/15/2012); 16.19.20.65(C)(32)(q)-(s) NMAC (12/19/2013); 16.19.20.65(C)(35)(t)-(ii) NMAC (10/16/2016); 16.19.20.65(E)(35)(jj)-(tt) NMAC (6/26/2018).

{20}     In its first addition of substances deemed "synthetic cannabinoids," the Board not only added fifteen specific chemicals to the list but also included a functional definition of "synthetic cannabinoids": "any material, compound, mixture o[r]

15

preparation which contains any quantity of the following synthetic cannabinoids which demonstrates binding activity to the cannabinoid receptor or analogs or homologs with binding activity[.]" 16.19.20.65(C)(32) NMAC (11/27/2011). This definition closely resembles the neurochemical definition adopted in other jurisdictions and used by the United Nations Office on Drugs and Crime (UNODC). *see* Colo. Rev. Stat. Ann. § 18-18-102(34.5)(a) (West 2014) (defining "synthetic cannabinoid" as "any chemical compound that is chemically synthesized and either: (I) [h]as been demonstrated to have binding activity at one or more cannabinoid receptors; or (II) [i]s a chemical analog or isomer of a compound that has been demonstrated to have binding activity at one or more cannabinoid receptors"); UNODC *Recommended Methods for the Identification and Analysis of Synthetic Cannabinoid Receptor Agonists in Seized Materials* 5, (2013) http://www.unodc.org/documents/scientific/STNAR48_Synthetic_Cannabinoids_ ENG.pdf (defining "synthetic cannabinoids" as "substances with structural features which allow binding to one of the known cannabinoid receptors, i.e. $CB_1$ or $CB_2$, present in human cells"). In its next addition the following year, the Board added a new subsection containing seven *classes* of chemicals rather than individual chemical compounds. 16.19.20.65(C)(32)(p)(i)-(vii) NMAC (6/15/2012). In its most recent additions, the Board has continued to add individual chemicals to the list of

16

"synthetic cannabinoids." *See* 16.19.20.65(C)(32)(q)-(s) NMAC (12/19/2013); 16.19.20.65(C)(35)(t)-(ii) NMAC (10/16/2016); 16.19.20.65(E)(35)(jj)-(tt) NMAC (6/26/2018).

{21} Presently, there are no fewer than fifty-six specific chemical compounds—the eleven enumerated in Section 30-31-6(C)(19)(a)-(k) and forty-five additional compounds identified in 16.19.20.65(E)(35)(a)-(o), (q)-(tt) NMAC—as well as seven classes of compounds, *see* 16.19.20.65(E)(35)(p)(i)-(vii) NMAC, that are considered to be "synthetic cannabinoids" in New Mexico. Additionally, "any material, compound, mixture or preparation . . . which demonstrates binding activity to the cannabinoid receptor or analogs or homologs with binding activity" is also a "synthetic cannabinoid" under New Mexico law. 16.19.20.65(E)(35) NMAC. As a limiting principle to this last point, we note that the Legislature has provided that "[t]he [B]oard shall place a substance in Schedule I if it finds that the substance: (1) has a high potential for abuse; and (2) has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision." Section 30-31-5(A). In other words, to qualify for placement in Schedule I, a substance must have certain characteristics, i.e., high potential for abuse *and* no accepted medical use. *See Montoya v. O'Toole*, 1980-NMSC-045, ¶ 7, 94 N.M. 303, 610 P.2d 190 (explaining that the Legislature has "established strict

statutory standards and directed the Board to apply them in categorizing substances");
*cf.* § 30-31-5(B)-(E) (establishing different standards and criteria for placing substances in Schedules II, III, IV, and V).

{22}     From the foregoing, then, we conclude the following: (1) the Legislature did not intend to limit the meaning of "synthetic cannabinoids" to only the eleven chemical compounds enumerated in Section 30-31-6(C)(19); (2) the list of "synthetic cannabinoids" contained in, and occasionally added to[3], 16.19.20.65 NMAC—both those identified by individual chemical compound and those provable to fall within any class of chemicals listed—must be understood as an extension of the list of substances prohibited under Section 30-31-6(C)(19); and (3) any substance that has a high potential for abuse, has no accepted medical use in treatment, and "demonstrates binding activity to the cannabinoid receptor or analogs or homologs with binding activity[,]" 16.19.20.65(E)(35) NMAC, also qualifies as a "synthetic cannabinoid" under the CSA, even if its specific chemical compound has not as yet been expressly added to either the statute or the regulation. *See Salazar*, 2018-

---

[3]The most recent additions to 16.19.20.65 NMAC occurred immediately prior to issuance of this opinion, increasing the number of prohibited compounds listed in the regulation from thirty-four to forty-five. And while the 2018 update to the regulation affects neither our analysis nor the disposition of this case, it reinforces both the ever-evolving nature of regulating this particular controlled substance and the need for litigants, experts, and courts to stay apprised of recent scientific developments and regulatory activity related to synthetic cannabinoids.

NMCA-030, ¶¶ 30, 35 (concluding that sufficient evidence supported the defendant's conviction for possession of synthetic cannabinoids where an expert in forensic chemistry testified that the substances—which contained chemicals that were not listed as controlled substances—were "synthetic cannabinoids" because "the chemicals mimic the effects of cannabis"). Thus, we further conclude that in order to sustain a conviction for an offense involving a substance alleged to be "synthetic cannabinoids," the State must prove beyond a reasonable doubt one of the following: that the substance (1) is one of the chemical compounds enumerated in either the statute or the regulation; (2) falls into of one of the classes of chemicals listed in the regulation; *or* (3) has a high potential for abuse, has no accepted medical use in treatment, *and* demonstrates binding activity to the cannabinoid receptor or analogs or homologs with binding activity. We next address whether the State met its burden in this case.

**II.     Proving the Identity of a Substance Suspected of Being a Synthetic Cannabinoid**

{23}     What becomes apparent from the process of defining "synthetic cannabinoids" is that such substances are inherently complex and not uniformly identifiable by visual inspection alone. Certainly, not every "green, leafy substance" that tests negative for THC and is found atop a bedroom dresser as opposed to, say, on a kitchen spice rack is necessarily a "synthetic cannabinoid." In light of our

19

interpretation of what the Legislature intended the term "synthetic cannabinoids" to mean and include, the conclusion we reach is that the State must introduce scientific evidence to prove the identity of a substance suspected of being a synthetic cannabinoid.

{24} The State contends that under New Mexico law, it was not required to do so and argues that lay opinion testimony and circumstantial evidence were sufficient to identify the substance in this case as a synthetic cannabinoid. The State—like the district court—relies on certain cases in which both this Court and our Supreme Court have held that identification of a substance by lay opinion may be used to help prove a substance's identity and that "the [s]tate need not introduce scientific evidence to prove the identity of a controlled substance." *State v. Stampley*, 1999-NMSC-027, ¶ 42, 127 N.M. 426, 982 P.2d 477; *State v. Godoy*, 2012-NMCA-084, ¶ 14, 284 P.3d 410 (explaining that "[a]lthough the [s]tate failed to present a laboratory analysis authenticating the substance found in [the d]efendant's car as crack cocaine, it was able to provide other evidence to support a conviction for drug possession, such as lay opinions"); *State v. Gerald B.*, 2006-NMCA-022, ¶ 23, 139 N.M. 113, 129 P.3d 149 (stating that "expert testimony is not required to identify illegal drugs"); *State v. Rubio*, 1990-NMCA-090, ¶ 8, 110 N.M. 605, 798 P.2d 206 ("The identity of a controlled substance *may further* be established by persons having lay experience

with the drug through prior use, trading, or law enforcement." (emphasis added)). However, those cases—and more to the point the substances at issue in those cases—are all distinguishable from the instant case and substance here at issue, something the district court failed to appreciate and the State fails to address or attempt to reconcile. We explain.

**A.    No New Mexico Case Has Held That the State May Prove the Identification of a Suspected Synthetic Cannabinoid Based on Lay Opinion and Circumstantial Evidence Alone**

{25}    None of the cases cited by the district court or the State—including an out-of-jurisdiction case cited by the State in its answer brief—involved synthetic cannabinoids. Rather, they involved other controlled substances, including crack cocaine, marijuana, methamphetamine, and cocaine. *See Stampley*, 1999-NMSC-027, ¶¶ 12, 42 (addressing a challenge to the sufficiency of the evidence supporting a conviction for trafficking crack cocaine); *Godoy*, 2012-NMCA-084, ¶ 14 (same for possession of crack cocaine); *Gerald B.*, 2006-NMCA-022, ¶ 1 (involving a charge of possession of marijuana); *State v. Attaway*, 1992-NMCA-043, ¶¶ 5, 23-24, 114 N.M. 83, 835 P.2d 81 (involving a challenge to the admissibility of a lay witness's testimony that the substance that the defendant is seen injecting into her arm in a videotape admitted into evidence was methamphetamine); *Rubio*, 1990-NMCA-090, ¶¶ 4, 8 (involving a challenge to the sufficiency of the evidence supporting a

conviction for possession of cocaine); *State v. Watson*, 437 N.W.2d 142, 143 (Neb. 1989) (per curiam) (involving charges of distribution and possession of methamphetamine and cocaine). This factual distinction is important because, as discussed previously, the CSA does not identify and define all substances in the same way. Specifically, neither "cocaine" nor "methamphetamine" is, in fact, defined at all in the CSA, nor is either described by its chemical composition even though each substance is, as the district court noted, identifiable by a particular chemical compound. *See* § 30-31-2 (containing no definition of "cocaine" or "methamphetamine"); § 30-31-7(A)(1)(d) (identifying "coca leaves and any . . . derivative . . . of coca leaves" as a type of Schedule II controlled substance but containing no chemical description of the coca-leaf derivative known as "cocaine"); § 30-31-7(A)(3)(c) (identifying "methamphetamine" as a type of Schedule II controlled substance but containing no definition or chemical description of that substance); *Webster's Third New Int'l Dictionary* 434 (Unabridged ed. 1986) (defining "cocaine" as "a bitter crystalline alkaloid $C_{17}H_{21}NO_4$ obtained from coca leaves and synthesized from ecogine"); *Id.* 1422 (defining "methamphetamine" as "an amine $C_6H_5CH_2CH(CH_3)NHCH_3$ used in the form of its crystalline hydrochloride as a stimulant for the central nervous system"). And while "marijuana" is defined in the CSA, that definition does not refer to or identify any particular chemical compound

22

derived from "marijuana" as being a controlled substance. *See* § 30-31-2(N). Thus, the chemically invariable substances at issue in the relied-upon cases are legally distinguishable from synthetic cannabinoids, a critical distinction overlooked by the district court and the State.

{26} Moreover, while those cases *allow* for lay identification of particular controlled substances to help support the identification of the substance, none stands for the proposition that lay identification of a substance constitutes sufficient evidence in every case. In any case where the State foregoes laboratory testing or does not seek to introduce scientific evidence of a substance's identity, it does so at the risk of a challenge to the sufficiency of the evidence. The relied-upon cases merely stand for the proposition that in certain cases, the State may still be able to meet its burden even in the absence of scientific evidence. Notably, in none of the aforementioned cases did a law enforcement officer's lay opinion identifying a substance based solely upon visual inspection serve as the sole, or even primary, evidence of the substance's identity. In *Rubio*, not only did the dealer who sold the substance to the defendant testify that the substance was cocaine but also there was evidence that the transaction took place in a "secretive manner" and that the substance was sold at a price of $200-225 for only one-eighth of an ounce. 1990-NMCA-090, ¶¶ 4, 9. In *Attaway*, though no chemical analysis of the substance was introduced, an expert testified that the

23

substance was methamphetamine. *See* 1992-NMCA-043, ¶ 21.[4] In *Stampley*, the substance was identified by two witnesses: the person who stole the substance from the defendant, and by a subsequent user of the stolen substance who testified to the effects that the substance had on her once taken. 1999-NMSC-027, ¶ 42. In *Gerald B.*, the child-defendant admitted to having "some marijuana," initially handed over "a small plastic sandwich bag from his pocket[,]" and upon being asked by the investigating officer if child-defendant had any more marijuana, "produced eight more sandwich bags." 2006-NMCA-022, ¶ 4. In *Godoy*, the substance was "field-tested for the presence of cocaine" and came back "positive." 2012-NMCA-084, ¶ 14. In that case, the defendant also admitted to being "a user and that the substance was for his personal use." *Id.* In other words, in all of the cases in which it has been held that the State need not introduce scientific evidence of a substance's identity to support a controlled substance conviction, there was significant circumstantial evidence from which the substance's identity could be reasonably inferred beyond a reasonable doubt.

---

[4]Notably, in *Attaway* the defendant challenged not the sufficiency of the evidence supporting his convictions but primarily evidentiary rulings. *See id.* ¶ 1. Regarding the testimony of the woman seen in a video where the defendant was injecting a substance into her arm that the substance was methamphetamine, the defendant attacked the admissibility of such testimony, arguing that the witness was not qualified to identify the substance. *Id.* ¶ 23.

{27} In light of the material factual and legal distinctions between the instant case and cases cited by the State and the district court, we conclude that we are not bound by the statements in those cases to the effect that the state need not introduce scientific evidence to prove the identity of a controlled substance. *See State v. Holt*, 2015-NMCA-073, ¶ 17, 352 P.3d 702 ("The established rule is that cases are not authority for propositions not considered." (alterations, internal quotation marks, and citation omitted)).

**B.   Even Under *Godoy*, *Stampley*, and *Rubio*, the Evidence Adduced in this Case Is Insufficient to Support Defendant's Conviction**

{28} Even were we to agree—and we do not—that the rule that "the [s]tate need not introduce scientific evidence to prove the identity of a controlled substance" applies or should be extended to apply in cases involving synthetic cannabinoids, we would still hold that there is insufficient evidence to support Defendant's conviction in this case. *Stampley*, 1999-NMSC-027, ¶ 42. Here, the State contends that the following pieces of evidence constitute sufficient circumstantial evidence to support Defendant's conviction:

> Defendant admitted to using 'spice.' The green[,] leafy substance was found on top of a piece of paper on a dresser in Defendant's bedroom. Defendant could barely stand up or walk. He could not comprehend what was being said to him. He was 'out of it.' His speech was slurred, his eyes were bloodshot, and his pupils were dilated. [Ms.] Lucero testified to her experience in dealing with people under the

25

influence of synthetic cannabinoids, and that, in her opinion, Defendant was under the influence of synthetic cannabinoids.

Even viewed in the light most favorable to supporting the verdict, this evidence fails to support a reasonable inference that the substance on Defendant's dresser was a synthetic cannabinoid.

{29}   First, Ms. Lucero's testimony that Defendant "self-admitted to using 'spice' " fails as sufficient circumstantial evidence in this case for three reasons: (1) because Ms. Lucero admitted that she could not say when Defendant admitted to having used "spice," (2) because even if Defendant had admitted that he used "spice" on or about the date charged in the indictment, such an admission still fails to prove that the substance found in Defendant's possession was a "synthetic cannabinoid," and (3) because there is no evidence that Defendant's admission to using "spice" was in any way a reference to or connected his impaired state with the "green, leafy substance" found on his dresser that served as the basis for his conviction. While "spice" is a common name for "synthetic cannabinoids," "spice" is not listed as a controlled substance under the CSA, and Defendant's admission to having used "spice" is not, without more, evidence that the "green, leafy substance" found on Defendant's dresser—a substance of unknown chemical makeup—was a synthetic cannabinoid. *Cf. State v. Romero*, 1964-NMSC-245, ¶¶ 3, 14, 74 N.M. 642, 397 P.2d 26 (rejecting the defendant's argument that proof that he was in possession of "marijuana" was

26

insufficient to prove that he possessed "cannabis sativa L." and reasoning that " '[m]arijuana' is the name by which cannabis is popularly known, *and is neither chemically nor physically distinguishable*" (emphasis added)); *Gerald B.*, 2006-NMCA-022, ¶¶ 4, 24 (noting that the child-defendant's admission that the substance found on his person was marijuana could be used as evidence supporting an inference that the substance was, in fact, marijuana). Additionally, any inference that could be drawn between Defendant's admission to using "spice" at some indeterminate point in the past, even along with Ms. Lucero's description of Defendant's appearance and behavior as being consistent with someone "under the influence of spice," and the chemical composition of the "green, leafy substance" would be speculative at best, rendering it insufficient. *See State v. Trossman*, 2009-NMSC-034, ¶ 24, 146 N.M. 462, 212 P.3d 350 ("Although a [fact-finder] is certainly entitled to draw reasonable conclusions from the circumstantial evidence produced at trial, it must not be left to speculate in the absence of proof." (citation omitted)).

{30} Second, the State fails to explain the significance of the fact that "[t]he green[,] leafy substance was found on top of a piece of paper on a dresser in Defendant's bedroom." Particularly in light of Ms. Lucero's testimony that synthetic cannabinoids are "packaged in, like, little, they, they have like little packages of 'em, almost kind of like, they've got like colors and different things on 'em, . . . almost like, kind of

27

like a foil, they come in , like, a foil baggie[,]" we fail to see how the fact that the substance was found on top of a receipt, not in any type of special packaging, somehow supports the conclusion that the substance was a synthetic cannabinoid. *Cf. Rubio*, 1990-NMCA-090, ¶ 8 ("In deciding whether the evidence was sufficient to show the substance in this case was cocaine, we may consider such circumstances as the appearance and packaging of the substance[.]"). Because the State offers no explanation or argument as to the import of that evidence, we consider it no further. *See State v. Murillo*, 2015-NMCA-046, ¶ 17, 347 P.3d 284 (explaining that where a defendant fails to develop requisite aspects of an argument, this Court "will not construct" an argument for him).

{31} Finally, Ms. Lucero's testimony that Defendant was behaving in a manner that she believed was consistent with the behavior of someone who is under the influence of synthetic cannabinoids—specifically that Defendant had bloodshot eyes and dilated pupils, was slurring his speech, and was "very out of it"—also fails to supply the necessary evidence to establish the identity of the substance. As the district court described it, Ms. Lucero's testimony "was general enough in nature that it could have described someone under the influence of alcohol . . . *or other substances.*"[5]

---

[5]We note that there was testimony that no alcohol was found in Defendant's home, but that fact does not dispose of the matter given that the district court found that Defendant's behavior could also be consistent with someone under the influence

(Emphasis added.) The district court even stated that it was not giving Ms. Lucero's testimony regarding Defendant's behavior "as much credence maybe as [the State] would hope" and that it was "not sure that [it] view[s that testimony] as being synthetic-cannabinoids specific." In light of the district court's own doubt regarding that evidence, we can hardly say that Ms. Lucero's testimony regarding Defendant's physical appearance and behavior supplies the necessary evidence to support the inference beyond a reasonable doubt that the substance found on Defendant's dresser was a synthetic cannabinoid. Particularly in the absence of any evidence causally connecting Defendant's appearance and behavior to ingestion of the substance found on his dresser, any conclusion that the substance was a synthetic cannabinoid is based on inferential speculation rather than permissible inference.

**C.     Synthetic Cannabinoids Are Sui Generis, and Proof That a Substance Is a Synthetic Cannabinoid Requires Scientific Evidence**

{32}     Synthetic cannabinoids are a type of controlled substance innately different than substances such as marijuana, cocaine, and methamphetamine because of the nearly innumerable possible chemical formulas that may—but also may not—qualify the substance as a synthetic cannabinoid. This point bears emphasizing because the way in which New Mexico regulates synthetic cannabinoids—albeit broadly and

of "other substances."

comprehensively—stops short of criminalizing artificially-produced substances that do not either bear one of the chemical structures enumerated in the statute or regulation or demonstrate binding activity to the cannabinoid receptor.

{33} As the State itself explains, "Synthetic drug manufacturers continually change their formulas[] and make slight alterations to known compounds in order to avoid formulations that are specifically outlawed." And here again, many such substances sold in the same place and manner and with similar packaging are completely legal. *See supra*, *Synthetic Drugs* (*a.k.a. K2, Spice, Bath Salts, etc.*) (explaining that "[s]ynthetic drugs are often sold at small retail outlets and are readily available via the Internet" and that "[t]he chemical compositions of synthetic drugs are frequently altered in an attempt to avoid government bans"). Despite this acknowledgment, the State in this case failed to present any competent evidence that would allow the district court to draw the specific inference that the substance found on Defendant's dresser was a "synthetic cannabinoid" as defined under the CSA. We note that Ms. Lucero conceded that she has "never positively identified a substance as a synthetic cannabinoid" and that confirmation of substances she *suspected* were synthetic cannabinoids had always occurred through scientific testing. Yet here, absent just such testing, when asked whether the substance was a synthetic cannabinoid, she responded affirmatively. Officer Loomis also testified that he typically sends

substances he suspects of being controlled substances for further testing at the state crime lab, though he could not recall whether he had done so in this case and confirmed that he had never seen a laboratory report in this case. Notably also, the State neither explains why it presented no scientific evidence in this case nor cites a single case—in New Mexico or elsewhere—where a conviction related to synthetic cannabinoids was sustained in the absence of scientific evidence of the substance's identity. Through our research, we were unable to find such a case.

{34}     Our research instead indicates that scientific evidence and expert testimony in this context are the unstated rule—possibly without exception—in cases involving synthetic cannabinoids, which makes good sense in light of the inherently complex nature of these substances. *See, e.g.*, *Salazar*, 2018-NMCA-030, ¶ 35; *see also United States v. Qattoum*, 826 F.3d 1062, 1064 (8th Cir. 2016) (explaining, in a case involving withdrawal of a guilty plea to charges of possession with intent to distribute synthetic cannabinoids, that the basis for the charges was law enforcement's seizure of substances that were "confirmed" through "lab analysis" to be synthetic cannabinoids or analogues); *United States v. Ramos*, 814 F.3d 910, 912-13 (8th Cir. 2016) (explaining that the substance contained in a packet purchased from the defendant's smoke shop and labeled "100% Cannabinoid Free/DEA Compliant" was "later test[ed] at a DEA laboratory [and that the testing] revealed that the packet

31

contained organic plant material sprayed with the Schedule I controlled substance XLR-11, a synthetic cannabinoid" and further noting that the government "also called expert witnesses to testify regarding the synthetic cannabinoids"); *State v. Rizal*, 389 P.3d 1006, 2017 WL 658708 **1, 10, 389 P.3d 1006 (Kan. Ct. App. 2017) (per curiam) (unpublished table decision) (explaining that "even the police did not know that the packages they confiscated contained naphthoylindole [(a synthetic cannabinoid)] until the crime lab tested the packages"); *State v. Goggin*, 333 P.3d 112, 114-15 (Idaho 2014) (explaining that in a case involving charges related to "synthetic cannabinoids," "[t]esting showed that one of these containers contained plant material treated with JWH–019 and the other two containers contained plant material treated with AM–2201" and that "[b]oth JWH–019 and AM–2201 are synthetic cannabinoids"); *State v. Toben*, 2014 SD 3, ¶¶ 5-6, 842 N.W.2d 647, 648-49 (S.D. 2014) (noting that after a controlled buy of substances labeled "non cannabinoid[,]" a state chemist analyzed the products and testified that "laypersons would not know the chemical structure of these substances: the determination requires a chemist, lab equipment, and expert knowledge").

{35}     We note that oftentimes, the process of proving a substance to be a synthetic cannabinoid involves not one but two steps. The first step, as illustrated in the cited cases, consists of scientifically testing the substance to determine what chemical

compound it consists of or, more accurately, has been applied to it. In cases where the chemical makeup of the substance matches an enumerated chemical compound listed in a statute or regulation, no additional evidence establishing the substance as a "synthetic cannabinoid" may be needed. *See Goggin*, 333 P.3d 112, 114-15. In cases where the chemical identified is not specifically listed, however, a second step is required in which additional evidence is presented to try to establish that the chemical comes within the definition of "synthetic cannabinoids." Typically, this comes in the form of expert testimony by a forensic scientist who can explain both the structure of the chemical compound and its effects, i.e., whether it fits within either a controlled class of chemicals or the neurochemical definition of "synthetic cannabinoids." *See Salazar*, 2018-NMCA-030, ¶ 35; *State v. Beaudette*, 2012-0871 (La. App. 1 Cir. 7/13/12; 97 So. 3d 600, 602-603 (per curiam) (considering a challenge to a conviction for possession with intent to distribute synthetic marijuana (JWH-018) or its analogue (JWH-210) on the basis that neither JWH-210, the substance the defendant possessed, nor "analogues" were listed as "synthetic cannabinoids" at the time the defendant possessed it, and relying on the expert testimony of an organic chemist to conclude that it was illegal to possess JWH-210 at the time the crimes allegedly occurred).

{36}     Here, the State failed to complete even the first step necessary to proving that the "green, leafy substance" was a "synthetic cannabinoid." The State introduced no

33

evidence that scientific testing was ever done to determine what chemicals were present in or applied to the substance found on Defendant's dresser, let alone the results of any such testing. Therefore, there can be no doubt that the State failed to prove that the "green, leafy substance" contained a chemical compound enumerated in Section 30-31-6(C)(19) or 16.19.20.65 NMAC. Absent any evidence of the chemical composition of the substance, it is impossible—and unnecessary—to consider whether the State met its alternative burden through the second step, i.e., by proving that the substance contained a chemical that falls either into one of the classes of chemicals listed in 16.19.20.65 NMAC, or within the neurochemical definition of "synthetic cannabinoid." Because the record is devoid of evidence proving that the "green, leafy substance" was a "synthetic cannabinoid" as defined in the CSA, we hold that there is insufficient evidence to support Defendant's conviction.

**CONCLUSION**

{37}    Today's opinion should not be construed as allowing those who illegally possess, manufacture, and/or distribute synthetic cannabinoids to flout the law and contribute to a growing scourge on society. Rather, it is a reminder to prosecutors that they bear the burden of proving every essential element of a crime charged beyond a reasonable doubt. The dangers presented by synthetic drugs, including synthetic

34

cannabinoids, are widely recognized and understandably of considerable concern to legislatures and law enforcement officials. *See supra*, *Synthetic Drugs* (*a.k.a. K2, Spice, Bath Salts, etc.*) (explaining that "[t]he effects of synthetic cannabinoids include severe agitation and anxiety, nausea, vomiting, tachycardia (fast, racing heartbeat), elevated blood pressure, tremors and seizures, hallucinations, dilated pupils, and suicidal and other harmful thoughts and/or actions"). We also recognize that the regulation and the enforcement of laws aimed at controlling synthetic cannabinoids present a significant challenge because of the ongoing efforts of manufacturers to avoid government bans by constantly altering chemical formulas in order to fall outside of existing laws and regulations. *See Tiplick v. Indiana*, 43 N.E.3d 1259, 1261 (Ind. 2015) (explaining that "[r]egulation of 'spice' is a particularly challenging pursuit, as minor variants in chemical structure can place the substances beyond the reach of criminal statutes without diminishing their psychotropic effects"). New Mexico's approach to regulating synthetic cannabinoids recognizes both the dangers and challenge of regulating synthetic cannabinoids as reflected by the comprehensive way in which such substances are banned, i.e., by individual chemical compound, classes of compounds, *and* neurochemical definition. Despite the Legislature's clear intention to regulate these dangerous substances as broadly and comprehensively as possible, the State is not relieved of its burden of

35

proving that a substance believed to be a synthetic cannabinoid is, in fact, such a substance.

{38} Because our Legislature has not criminalized and subjected to control under the CSA all "green, leafy substances," the district court's conviction of Defendant for possession of synthetic cannabinoids based on little more than Defendant's possession of a "green, leafy substance" and two witnesses' unconfirmed lay opinions that the "green, leafy substance" was a synthetic cannabinoid cannot stand. As such, we reverse Defendant's conviction and remand this case to the district court for entry of a judgment of acquittal.

{39} **IT IS SO ORDERED.**


_____
**J. MILES HANISEE, Judge**



**WE CONCUR:**


_____
**M. MONICA ZAMORA, Judge**


_____
**HENRY M. BOHNHOFF, Judge**

36